McCrystie Adams (CO Bar # 34121)
*Admitted Pro Hac Vice*
Defenders of Wildlife
535 16th Street, Suite 310
Denver, CO 80202
(720) 943-0459
madams@defenders.org

Michelle Uberuaga (MT Bar #11611)
Law Office of Michelle Uberuaga Z.,
PLLC
P.O. Box 711
Livingston, MT 59047
(406) 223-4714
michelle.uberuaga@gmail.com

William S. Eubanks II (CO Bar #49410)
*Admitted Pro Hac Vice*
Meyer Glitzenstein & Eubanks LLP
2601 S. Lemay Avenue
Unit 7-240
Fort Collins, CO 80525
(970) 703-6060
beubanks@meyerglitz.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE and NATURAL RESOURCES DEFENSE COUNCIL, | ) ) ) CV-15-14-GF-BMM ) |
| Plaintiffs, | ) ) **PLAINTIFFS' OPPOSITION TO** |
| v. | ) **FEDERAL DEFENDANTS'** ) **MOTION FOR PARTIAL** ) **DISMISSAL FOR WANT OF** |
| UNITED STATES ARMY CORPS OF ENGINEERS, UNITED STATES BUREAU OF RECLAMATION, and UNITED STATES FISH AND WILDLIFE SERVICE, | ) **JURISDICTION AND TO** ) **DISSOLVE PRELIMINARY** ) **INJUNCTION** ) ) |
| Defendants, | ) ) |

and )
)
LOWER YELLOWSTONE IRRIGATION )
PROJECT BOARD OF CONTROL, )
SAVAGE IRRIGATION DISTRICT, and )
INTAKE IRRIGATION DISTRICT, )
)
Defendant-Intervenors. )

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................ 3

I. THE EFFECTS OF INTAKE AND FORT PECK DAMS
ON PALLID STURGEON ............................................................. 3

II. FEDERAL DEFENDANTS' FIRST ATTEMPT TO ADOPT THE
BYPASS CHANNEL ALTERNATIVE AND THE COURT'S
SEPTEMBER 2015 INJUNCTION ORDER ................................................. 3

III. THE 2016 FINAL ENVIRONMENTAL IMPACT STATEMENT,
RECORD OF DECISION, AND BIOLOGICAL OPINION ........................ 6

IV. DEFENDERS' FORTHCOMING CHALLENGES TO THE AGENCIES'
2016 DECISION DOCUMENTS ................................................................. 8

ARGUMENT .................................................................................................. 9

I. THE EXISTING INJUNCTION SHOULD BE MAINTAINED UNTIL
THE COURT CAN ADJUDICATE THIS CASE ON THE MERITS ......... 10

   A.    The Standard for Dissolution of Injunctions ...................................... 10

   B.    The Final EIS and ROD Do Not Remedy the Deficiencies
         Identified in the Court's Injunction Order ......................................... 12

   C.    The Final EIS and ROD Do Not Undermine the Court's
         Rationale for its Finding on Irreparable Harm .................................. 18

   D.    The Final EIS and ROD Do Not Undermine the Court's
         Rationale for its Findings on the Balance of the Harms
         and Public Interest ......................................................................... 18

II. DEFENDERS' NEPA CLAIM IS NOT MOOT ........................................ 21

III.    THE AGENCIES' RUSH TO DISSOLVE THE INJUNCTION
        IS UNWARRANTED AND WOULD EFFECTIVELY
        PRECLUDE FULL JUDICIAL REVIEW OF THIS PROJECT
        BEFORE WORK IS COMMENCED ..........................................................23

CONCLUSION ....................................................................................................26

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alliance for the Wild Rockies v. Bradford,
    2013 WL 12134043 (D. Mont. Aug. 20, 2013) ...........................................21

Alliance for the Wild Rockies v. Kruger,
    15 F. Supp. 3d 1052 (D. Mont. 2014)..........................................................21

Conservation Cong. v. U.S. Forest Service,
    2016 WL 1162676 (E.D. Cal. March 24, 2016) .........................................21

Credit Suisse First Bos. Corp. v. Grunwald,
    400 F.3d 1119 (9th Cir. 2005)....................................................................10

Forest Guardians v. Johanns,
    450 F.3d 455 (9th Cir. 2006)......................................................................22

Friends of the Wild Swan v. U.S. Forest Service,
    2014 WL 1347987 (D. Mont. April 4, 2014).......................................12, 21

Hapner v. Tidwell,
    621 F.3d 1239 (9th Cir. 2010)............................................................. 10, 11

In re Detroit Auto Dealers Assoc., Inc.,
    84 F.3d 787 (6th Cir. 1996)........................................................................10

Lands Council v. Krueger,
    2014 WL 6629591 (D. Idaho Nov. 21, 2014)........................... 12, 13, 21, 25

Moon v. GMAC Mortgage Corp.,
    2008 WL 4741492 (W.D. Wash. Oct. 24, 2008) ........................................11

Native Ecosystems Council v. Krueger,
    2015 WL 5164994 (D. Mont. Aug. 31, 2015) ................................. 11, 12, 21

Native Ecosystems Council v. Tidwell,
    2011 WL 4972598 (D. Mont. Oct. 19, 2011) ............................................. 11

Or. Natural Desert Ass'n v. McDaniel,
      282 F.R.D. 533 (D. Or. 2012) ........................................................10

S.D. Myers, Inc. v. City & Cnty. of San Francisco,
      253 F.3d 461 (9th Cir. 2001) ........................................................22

Sharp v. Weston,
      233 F.3d 1166 (9th Cir. 2000) ......................................................10

Swan View Coalition v. Barbouletos,
      639 F. Supp. 2d 1187 (D. Mont. 2009) .........................................11

Univ. of Haw. Prof'l Assembly v. Cayetano,
      125 F. Supp. 2d 1237 (D. Haw. 2000) ..........................................10

United States v. Oregon,
      769 F.2d 1410 (9th Cir. 1985) ......................................................10

United States v. Swift & Co.,
      189 F. Supp. 885 (D. Ill. 1960) .................................................... 11

## FEDERAL STATUTES

16 U.S.C. § 1540(g). ...............................................................................8

## Exhibit Index

**Exhibit 1**

Lower Yellowstone Intake Diversion Dam Fish Passage Project, Montana, FINAL – Appendix F, Public Participation, Comments, and Responses (excerpts)

**Exhibit 2**

Defenders of Wildlife and Natural Resources Defense Council, Notice of Intent to Sue to Remedy Violations of the Endangered Species Act in Connection with the Lower Yellowstone Intake Diversion Dam Fish Passage Project (December 20, 2016)

**Exhibit 3**

Lower Yellowstone Intake Diversion Dam Fish Passage Project, Montana, FINAL – Appendix I, Independent External Peer Review Documentation

**Exhibit 4**

Hapner v. Tidwell, 08-cv-00092-DWM, Doc. 83 (February 8, 2010)

**Exhibit 5**

Email from Zachary Shattuck, Re: Intake Comment (August 5, 2016)

**Exhibit 6**

Email from Zachary Shattuck, Re: Intake Comment (August 4, 2016)

# INTRODUCTION

The U.S. Army Corps of Engineers ("Corps"), U.S. Bureau of Reclamation ("Reclamation"), and U.S. Fish and Wildlife Service ("FWS") (collectively, "Federal Defendants" or "the agencies") seek dissolution of this Court's September 4, 2015 injunction halting construction of a concrete dam that would span the Yellowstone River. Federal Defendants argue for dissolution based on two theories: (1) the agencies have addressed the errors identified by the Court's injunction order; and (2) the underlying claim under the National Environmental Policy Act ("NEPA") should be dismissed as moot due to the existence of a new NEPA analysis. However, courts do not dissolve injunctions based on the mere existence of a new NEPA analysis that purportedly moots the underlying claim. Rather, as this Court and others within the Ninth Circuit have made clear, Federal Defendants must demonstrate that their new analysis fully remedies the deficiencies identified by the Court in its injunction order. Federal Defendants' new NEPA analysis fails that well-established test and, in any event, is not moot.

This Court halted the construction of the proposed concrete dam in September 2015 primarily because Federal Defendants failed to evaluate whether the harm caused by the dam would be mitigated by a planned bypass channel for pallid sturgeon. Nothing has changed that would address this failure. Although Federal Defendants completed an Environmental Impact Statement ("EIS") in

December 2016, they adopted the exact same plan (the "Bypass Channel Alternative" or "Project") and failed to conduct the analyses required by NEPA and ordered by the Court. In fact, the EIS specifically acknowledges that the agencies did not examine the effects of the Project on pallid sturgeon recovery, one of the specific requirements of the Court's order. Because the agencies failed to remedy all of the errors identified by the Court, Federal Defendants' motion should be denied and the injunction maintained until the Court can fully adjudicate the merits of this case.

Plaintiffs Defenders of Wildlife and Natural Resources Defense Council ("Defenders") intend to seek leave to supplement their operative complaint to challenge the 2016 approvals of the Project once jurisdiction has vested for claims that will be brought pursuant to the Endangered Species Act ("ESA") citizen-suit provision, which will occur on March 6, 2017. Pursuant to Federal Rule of Civil Procedure 56, Defenders anticipates briefing the merits on an expedited schedule in order to resolve these issues in a manner that provides for pallid sturgeon survival and recovery as soon as possible. In the meantime, maintaining the existing prohibitory injunction is essential to provide an opportunity for judicial review of the merits of this case on the basis of the full administrative record, before any work is commenced on a Project that is illegal and likely ensures the extirpation of the wild population of pallid sturgeon from Montana's rivers.

# BACKGROUND

## I. THE EFFECTS OF INTAKE AND FORT PECK DAMS ON PALLID STURGEON

Reclamation's operation of Intake Dam and the Corps' operation of Fort Peck Dam have nearly extirpated the wild population of the endangered pallid sturgeon from the upper Missouri River basin. <u>See</u> Doc. 28 at 5. These dam operations disrupt the pallid sturgeon's spring spawning migrations and destroy spawning and nursery habitat. <u>See</u> Doc. 28 at 5-7. As a result, all young pallid sturgeon in this basin die within weeks of hatching, and the wild population has likely dwindled to less than 100 aging individuals. <u>See id.</u>; Doc. 104-1 at xxxiii (Final EIS population estimate). Even with these small numbers, this population is critical to the ultimate survival of the species in part because it is the largest remaining wild population. <u>See</u> Doc. 28 at 5. Unless the operation of at least one—and more likely both—dams are modified in a way that restores spawning and nursery habitat and allows sufficient upstream migration, the wild population will inevitably disappear from this river basin. <u>See id.</u> at 5-7.

## II. FEDERAL DEFENDANTS' FIRST ATTEMPT TO ADOPT THE BYPASS CHANNEL ALTERNATIVE AND THE COURT'S SEPTEMBER 2015 INJUNCTION ORDER

Defenders brought this lawsuit to challenge the ongoing, unlawful operations of both dams. <u>See</u> Doc. 1 (complaint filed February 2, 2015 alleging five ESA claims). Two months later, Reclamation and the Corps issued an

Environmental Assessment ("EA") and "Finding of No Significant Impact" ("FONSI") authorizing the construction of the Bypass Channel Alternative at Intake Dam. See Doc. 28 at 9-10. This Project, then as now, involved building a new concrete dam across the Yellowstone River, filling in a natural side channel that pallid sturgeon have used to swim around the existing rock dam, and constructing an artificial bypass channel for pallid sturgeon passage. Id. The Project was intended to cure Reclamation's ongoing ESA violations at Intake Dam that are jeopardizing this species' survival and recovery prospects. See id. at 8-9. The Corps' involvement and funding of the Project at that time was expressly premised on an (unlawful) agreement between the Corps and FWS that the Project would also remedy the Corps' ongoing ESA violations at Fort Peck Dam. See Doc. 28 at 8-9; Doc. 54 at 6-7.

Defenders filed two separate motions seeking a preliminary injunction to halt the construction of the Project until the Court could fully adjudicate the case, one based on the claim that the EA and FONSI violated NEPA, and one based on claims that the Project violated the ESA and CWA. See Docs. 27, 28 (June 17, 2015); 53, 54 (July 28, 2015).

On September 4, 2015, the Court granted both motions and enjoined the agencies from "further implementing the Project until dissolution of the preliminary injunction." Doc. 73 at 20 (citing Docs. 27, 53). The Court concluded

that Defenders "demonstrated substantial questions going to merits" of whether the

NEPA analysis was inadequate.  Doc. 73 at 19; <u>see id.</u> at 7.  The Court described

several specific deficiencies in the EA:

- The EA's failure to analyze "whether the pallid sturgeon actually would be likely to use the bypass channel."  Doc. 73 at 8.

- The EA's failure to "consider whether similar bypass channels have been successful in the past."  <u>Id.</u>

- The EA's failure to analyze "whether the bypass channel likely would allow a sufficient number of pallid sturgeons to spawn so that the species could recover, or whether a new weir will prevent pallid sturgeon from recovering."  <u>Id.</u>

- The EA's "uncertainty regarding possible effects on the viability of pallid sturgeon larvae."  <u>Id.</u> at 12.

The Court also observed that the lack of analysis of the Project's effects on

pallid sturgeon recovery made it impossible to determine whether the Project

complied with the ESA.  Doc. 73 at 11 ("This Court cannot, in turn, determine . . .

whether the Project would violate the ESA unless the Court possesses more

information about the anticipated success of the proposed bypass channel.").  The

Court specifically mandated that "[t]he new analysis should include the anticipated

effects of the Project on the recovery of the pallid sturgeon."  <u>Id.</u> at 11-12.

The Court's findings on the equitable factors reflect the same concerns.  The

Court found that Defenders demonstrated that "irreparable harm likely would

occur in the absence of a preliminary injunction" primarily because the agencies

failed to complete the analyses required by NEPA to determine whether this

Project will avert the harm caused by the new dam. Id. at 17 ("the Court cannot

know whether the bypass channel will mitigate the harm caused by the new weir").

    Similarly, with respect to the balance of the hardships and the public

interest, the Court concluded "the prudent approach requires a careful

consideration of the environmental impacts before proceeding with the Project."

Id. at 17-18. Requiring the agencies to complete the legally-required analysis "will

ensure that the Federal Defendants understand the impacts on pallid sturgeon and

can address these impacts appropriately." Id.

## III.   THE 2016 FINAL ENVIRONMENTAL IMPACT STATEMENT, RECORD OF DECISION, AND BIOLOGICAL OPINION

Following the Court's injunction order, the parties stipulated to a stay of the

litigation while the agencies completed an EIS and new reviews pursuant to the

ESA and CWA. See Doc. 84. After publishing a Draft EIS for public review on

June 3, 2016, the Corps and Reclamation published the Final EIS on October 21,

2016. Doc. 102-1 at 3. The EIS evaluated six alternatives, including two dam

removal alternatives. Doc. 104-1 at xlv - xlix (Final EIS). One of the dam

removal alternatives, called the "Multiple Pumps" alternative, would restore the

Yellowstone River as a free-flowing river and install a pumping system to deliver

water to the irrigation districts. Id. at xlviii (describing Multiple Pumps

alternative). Several independent scientists noted that dam removal is indisputably

the best option for pallid sturgeon survival and recovery.  See, e.g., Doc. 102-1 at

92 (Montana Chapter of the American Fisheries Society ("AFS") comments on

Final EIS); Exh. 1 at 23 (Appendix F to Final EIS) (Upper Basin Pallid Sturgeon

Workgroup comments on Draft EIS).[1]

Nonetheless, on December 2, 2016, the Corps and Reclamation issued a

Record of Decision ("ROD") again adopting the Bypass Channel Alternative.

Doc. 102-1.  The ROD was accompanied by FWS's Biological Opinion and the

Corps' CWA findings.  Doc. 102-2, 102-3, 103-1, 103-2, 103-3 (Biological

Opinion).[2]

However, nothing in the Final EIS and ROD analyzes the impacts of the

Project on pallid sturgeon recovery as required by the Court.  Instead, the agencies

asserted that "such an analysis would be entirely speculative" due to a lack of data

about pallid sturgeon.  Doc. 104-1 at xxxviii (Final EIS); see also Doc. 102-1 at 15

(ROD).  Similarly, nothing in the Final EIS or ROD provides an analysis that can

answer the most fundamental question framed by this Court concerning the bypass

channel—whether pallid sturgeon will actually use it.  Although the Final EIS's

executive summary includes a section entitled "Likelihood of Success for Bypass

---

[1]      All page citations are to the PDF page numbers.
[2]      The Corps' CWA Section 404 findings are found in Appendix C to the Final
EIS, which is available on Reclamation's website.
https://www.usbr.gov/gp/mtao/loweryellowstone/ (last visited February 21, 2017).

Channel," this section does not contain the required analysis.  Instead, the Final

EIS states "[t]he agencies recognize the uncertainties" regarding pallid sturgeon

passage and primarily relies on the same design criteria relied on in the 2015 EA,

anecdotal information about pallid sturgeon use of side channels, and the

implementation of a Monitoring and Adaptive Management Plan to monitor the

channel's success <u>after</u> it is built—i.e., once construction is complete and

remedying harm to the pallid sturgeon is far more difficult, if it is possible at all.

Doc. 104-1 at li.

## IV.    DEFENDERS' FORTHCOMING CHALLENGES TO THE AGENCIES' 2016 DECISION DOCUMENTS

On December 20, 2016, shortly after the publication of the ROD, Defenders

sent a 60-day Notice of Intent to Sue to the Corps, Reclamation, and the Secretary

of the Interior describing the Corps' and Reclamation's failure to comply with the

ESA in connection with the adoption of the Project.  <u>See</u> Exh. 2.  A notice letter is

a jurisdictional prerequisite for ESA claims brought pursuant to the ESA citizen-

suit provision, 16 U.S.C. § 1540(g), which applies to some of Defenders'

anticipated ESA claims.

As previously represented to the parties and the Court, as soon as the

jurisdictional 60-day period elapses for the ESA citizen-suit claims, Defenders will

request leave to file a Fourth Supplemental and Amended Complaint, preserving

its existing claims against ongoing dam operations and alleging ESA, NEPA,

CWA, and Administrative Procedure Act claims arising from the agencies' 2016 approvals of the Project. <u>See</u> Doc. 92 at 3-4.[3] If the injunction remains in place, and once the agencies provide a complete administrative record, Defenders proposes to brief the merits of these claims on an expedited schedule, which would ensure that any such relief on the merits may benefit the species as soon as practicable under the circumstances. <u>See id.</u>

In the alternative, should the Court grant the agencies' instant motion and dissolve the existing injunction, Defenders will have no choice but to seek a new emergency injunction based on the ways in which the 2016 approvals of the Project violate NEPA, the ESA, and the CWA. Thus, dissolution of the current injunction will not only require the Court to expend judicial resources resolving another injunction request without an administrative record and on an expedited basis, but the additional injunction briefing would likely again delay resolution of the merits (and ultimate benefits to the pallid sturgeon).

## ARGUMENT

Federal Defendants argue that the injunction should be dissolved because, according to the agencies, (1) they remedied the errors identified by the Court, and

---

[3]     Defenders anticipates filing this motion on March 6, 2017, the first business day after the 60-day period elapses from the last date of receipt.

(2) Defenders' NEPA claim was rendered moot upon the issuance of the EIS.  Both

arguments fail, as explained below.

## I. THE EXISTING INJUNCTION SHOULD BE MAINTAINED UNTIL THE COURT CAN ADJUDICATE THIS CASE ON THE MERITS

### A.  The Standard for Dissolution of Injunctions

"[C]ourts have continuing jurisdiction to terminate, dissolve, vacate, or

modify an injunction or an interlocutory order in the event that changed

circumstances require it."  Univ. of Haw. Prof'l Assembly v. Cayetano, 125 F.

Supp. 2d 1237, 1240 (D. Haw. 2000) (citing United States v. Oregon, 769 F.2d

1410, 1416 (9th Cir. 1985), In re Detroit Auto Dealers Ass'n, 84 F.3d 787, 789

(6th Cir. 1996)); Hapner v. Tidwell, 621 F.3d 1239, 1243 (9th Cir. 2010) (restating

with approval Judge Molloy's holding that the court "retains jurisdiction over an

injunction, even in the absence of an express statement to that effect").  Pursuant to

Federal Rule of Civil Procedure 54(b), a district court may modify an injunction

"at any time" before entry of final judgment.  Or. Natural Desert Ass'n v.

McDaniel, 282 F.R.D. 533, 538-39 (D. Or. 2012) (citing Credit Suisse First Bos.

Corp. v. Grunwald, 400 F.3d 1119, 1124 (9th Cir. 2005)).

To obtain dissolution of an injunction, Federal Defendants bear the burden

of "establishing that a significant change in facts or law warrants revision or

dissolution of the injunction."  Sharp v. Weston, 233 F.3d 1166, 1170 (9th Cir.

2000) (citations omitted).  A "significant change" is a change "that pertains to the

underlying reasons for the injunction." Moon v. GMAC Mortgage Corp., 2008 WL 4741492, at *2 (W.D. Wash. Oct. 24, 2008) (citing United States v. Swift & Co., 189 F. Supp. 885, 905 (D. Ill. 1960), aff'd per curiam, 367 U.S. 909 (1961)). This change must address and remedy the deficiencies identified by the injunction order. See, e.g., Native Ecosystems Council v. Krueger, 2015 WL 5164994, at *1-2 (D. Mont. Aug. 31, 2015) (Morris, J.) (denying motion to dissolve injunction for failure to conduct analysis required by the Court in prior injunction order); Native Ecosystems Council v. Tidwell, 2011 WL 4972598, *1 (D. Mont. Oct. 19, 2011) (Molloy, J.) (describing Ninth Circuit order reinstating district court's injunction because the new NEPA document did not address the deficiencies identified in the original injunction order) (citing Hapner v. Tidwell, 621 F.3d 1239 and Doc. 83 (February 8, 2010) (unpublished, attached as Exh. 4)).

Accordingly, courts do not automatically dissolve injunctions simply because an agency issues a new decision that supersedes the decision originally enjoined. See Swan View Coal. v. Barbouletos, 639 F. Supp. 2d 1187, 1190 (D. Mont. 2009) (warning U.S. Forest Service that assuming the issuance of a new decision document automatically dissolves an injunction could be grounds for criminal contempt proceedings). Instead, where an agency issues decision documents that supersede a decision that has been enjoined, courts review the contents of the new documents to determine whether they fully remedy the

substantive deficiencies that were previously identified.  See, e.g., Native Ecosystems Council v. Krueger, 2015 WL 5164994, at *1-2 (reviewing new biological opinion to determine if it contained the analysis ordered by the Court); Friends of the Wild Swan v. U.S. Forest Serv., 2014 WL 1347987, at *3-5 (D. Mont. April 4, 2014) (granting second motion to dissolve injunction upon review of cumulative impacts analysis in new NEPA document, after denying first motion for dissolution because first agency attempt failed to comply with NEPA).  In the context of a motion to dissolve, courts do not review the merits of the new decision overall or any new claims that plaintiffs may bring against it.  Lands Council v. Krueger, 2014 WL 6629591, at *4 (D. Idaho Nov. 21, 2014) (describing standard of review for motion to dissolve injunction).

### B.  The Final EIS and ROD Do Not Remedy the Deficiencies Identified in the Court's Injunction Order

The underlying reasons for the Court's September 4, 2015 injunction have not fundamentally changed.  Although the agencies assert that the Final EIS and ROD contain a "detailed" analysis that "remedie[s] the issues identified by the Court in its preliminary injunction order," this is not borne out by either document. Doc. 101 at 10-11 (citing Exh. A (Doc. 104-1) and Exh. B at l - lviii (Doc. 104-2)).

Specifically, the Court required the agencies to conduct a recovery analysis, and the agencies concede that they did not.  See Doc. 73 at 8, 12 (order); Doc. 104-1 at xxxviii (Final EIS).  They claim instead that a recovery analysis "would be

entirely speculative."  Doc. 104-1 at xxxviii (Final EIS).[4]  Absent such an analysis, the Final EIS and ROD do not remedy a critical aspect of the Court's injunction order.  For this reason alone, Federal Defendants' motion should be denied.

Moreover, as is evident from the agencies' admission that there is no successful precedent for this completely untested bypass channel, see Doc. 104-3 at 4-204 (Final EIS), nothing in the agencies' cited pages in the executive summary or elsewhere in the Final EIS or ROD purports to answer the most fundamental question framed by this Court concerning the bypass channel—whether pallid sturgeon would actually use it.

Thus, although the ROD and Final EIS assume that the bypass channel could meet the Biological Review Team's ("BRT") stated objective of passing 85% of the pallid sturgeon that reach Intake Dam (Doc. 102-1 at 23, Doc. 104-3 at 232), several independent scientists criticized the lack of support for this assumption. For example, an expert peer review panel commissioned by the Corps to review the Draft EIS concluded that there was no evidence to support the agencies' assumption of success.

---

[4]      To the extent Federal Defendants argue in their reply brief that this conclusion is justified for any reason, such an argument (which Defenders would dispute) can only be resolved after briefing on the merits of the legality of the new decision documents.  See Lands Council, 2014 WL 66295951, at *4 (noting that court's ruling on motion to dissolve injunction does not address or resolve the merits of the new agency action).

> [E]vidence to support [an 85% passage rate] as an achievable objective
> under the preferred alternative has not been provided in the DEIS. The
> Panel believes there is substantial risk that the preferred alternative
> bypass channel will not provide upstream passage of pallid sturgeon in
> significant numbers to facilitate a measurable, population-level
> response in natural recruitment.

Exh. 3 at 9, 23 (Appendix I to Final EIS) (emphases added). In other words, the

peer review panel concluded that there is "a substantial risk" that the proposed

bypass channel will fail to "facilitate a measurable, population level response" and

thus fail to avert the ongoing jeopardy (i.e., significant impairment of survival and

recovery) the agencies are causing to this highly imperiled species. Id. As the

basis for this conclusion, the expert panel described the evidence that is missing:

> There is no evidence that the behavior of adult fish can be manipulated
> to attract them to the bypass channel, that they would be motivated to
> swim upstream through the bypass channel, or that they would navigate
> upstream through the proposed bypass channel in sufficient numbers to
> enable meaningful levels of spawning and recruitment in the
> Yellowstone River.

Exh. 3 at 23 (Appendix I to Final EIS).

The Upper Basin Pallid Sturgeon Workgroup ("Workgroup"), composed of

state and federal scientists charged with advising FWS on pallid sturgeon recovery

implementation, separately echoed similar concerns in a comment letter on the

Draft EIS:

> To this point, the improvement of fish passage for Pallid Sturgeon and
> other native fishes under the preferred Bypass Channel Alternative is
> purely theoretical and assurances for successful passage are unfounded.

Exh. 1 at 24 (Appendix F to Final EIS) (emphasis added).[5]  Similarly, other

stakeholders and scientists noted that the agencies' analysis on this key point

lacked any basis in logic or scientific evidence.  See id. at 10-11 (Appendix F to

Final EIS) (State of Montana quoting Draft EIS statement that "[a] fish passage

efficiency study could provide critical research information … to inform the design

of future bypasses for shovelnose (and pallid) sturgeon" and noting that the lack of

such a study "seems to indicate that [] little is known about upstream passage

requirements for Pallid Sturgeon."); Doc. 102-1 at 92 (Montana Chapter of AFS

criticizing reliance on a bypass channel that "may or may not support passage by

Pallid Sturgeon" in comments on Final EIS); Doc. 102-1 at 99 (Montana Trout

Unlimited listing "a myriad of factors that influence fish movement" and noting

that "[n]one of these have been properly evaluated [in the Final EIS] in

---

[5]     According to the Final EIS, this comment letter does not represent the views
of Workgroup members who are employed by the Corps, Reclamation, or FWS—
the three agencies with approval authority over the Project and defendants in this
lawsuit.  Exh. 1 at 30, LA-02, comment 1 (Appendix F to Final EIS).  In addition,
after the close of the public comment period, the Workgroup requested that its
comments be retracted because it "inadvertently omitted established aspects of
review, as outlined in the [Workgroup's Operating Procedures]."  Id. at 27.
According to documents obtained through a Montana Public Records Act request,
FWS Missouri River Coordinator Casey Kruse requested the retraction.  Exh. 5
(Shattuck email, Aug. 5, 2016).  The Chair of the Workgroup stated that the
comment letter had "drawn a bit of disapproval" apparently because it "strays from
[FWS's] position on the project" and because it was not fully vetted "through the
chain-of-command."  Exh. 6 (Shattuck email, Aug. 4, 2016).

determining the probability of whether spawning pallid sturgeon in sufficient numbers will successfully navigate the bypass channel").[6]

To address this lack of evidence, the expert peer review panel "suggest[ed] that an alternative analysis be conducted that assesses the potential for upstream passage exclusively for pallid sturgeon for each stated alternative." Exh. 3 at 9, 24. (App. I to Final EIS). This is exactly the type of analysis required by the Court. Doc. 73 at 8. Nonetheless, the Corps declined to do so. The Corps stated that additional analyses that could help determine the probability of upstream passage or that would help predict recruitment success were not feasible. Exh. 3 at 98-99 (Appendix I to Final EIS). Instead, the Corps reiterated its reliance on its design

---

[6]    Several stakeholders and scientists also commented that the Draft EIS's analysis of larval survival on the downstream drift—a critical component of the recovery analysis ordered by the Court—was insufficient. See, e.g., Exh. 1 at 24 (Appendix F to Final EIS) (Workgroup commenting, "The design in the preferred Bypass Channel Alternative fails to incorporate adequate passage in the downstream drift of Pallid Sturgeon larvae"); id. at 28 (Montana Chapter of AFS commenting, "In the event Pallid Sturgeon use the engineered bypass, construction of a dam across the entire Yellowstone River will necessarily negatively impact this important life stage."); id. at 11 (State of Montana commenting that "even if passage is achieved, there was insufficient discussion of downstream passage of larval Pallid Sturgeon to complete the lifecycle required for recruitment" in Draft EIS). The peer review panel agreed that these impacts must be addressed. See Exh. 3 at 86 (Appendix I to Final EIS) ("By not including information on the extent of fish larvae mortality, particularly for the pallid sturgeon, estimates of the benefits to fish populations … may not be accurate."). In response, the agencies included additional information on potential effects, but conceded the additional information was not sufficient to estimate larval fish mortality from "rock and similar structures." Id. at 126.

criteria for the bypass channel (including flow, velocity, and depth of the channel), and provided some additional information, primarily regarding pallid sturgeon use of side channels, to the Final EIS.  Id.  The Court has already rejected reliance on the design criteria (Doc. 73 at 8), and the anecdotal evidence about use of side channels does not constitute an empirical analysis of whether pallid sturgeon will actually use the proposed artificial channel.  Indeed, upon reviewing the Corps' response, the expert peer review panel reiterated its opinion that there is a "substantial risk" that the bypass channel "may not provide upstream passage of pallid sturgeon in numbers consistent with the BRT criteria outlined in Section 4.9.3." Exh. 3 at 100 (Appendix I to the Final EIS).  The expert panel also reiterated its comment that "[t]here is a lack of data on pallid sturgeon passage behavior and it is uncertain how many pallid sturgeon may be motivated to pass upstream through a bypass channel."  Id.

In short, Federal Defendants did not complete the analysis required by the Court and are well aware that the agencies' predictions for success are unsupported as a result.  Thus, neither the public nor the Court are in any better position to evaluate the likely success of the Project for pallid sturgeon survival or recovery than they were in 2015.  Because the agencies failed to remedy the deficiencies identified by the Court's September 2015 Order, the agencies' motion to dissolve the injunction should be denied.

## C. The Final EIS and ROD Do Not Undermine the Court's Rationale for its Finding on Irreparable Harm

The agencies do not specifically assert that there has been any "significant change" that would undermine the Court's finding that Defenders demonstrated that "irreparable harm would occur in the absence of a preliminary injunction." Doc. 73 at 17 (September 2015 order). Indeed, nothing significant has changed. If the proposed dam is constructed, the same harms to the pallid sturgeon and Defenders' interest in ensuring the survival of this endangered species will occur. Further, as described above, the Court is in no better position to determine whether the bypass channel could adequately mitigate the harm caused by the new dam than it was in September 2015. See id. ("the Court cannot know whether the bypass channel will mitigate the harm caused by the new weir"). As a result, the Court's dissolution of the injunction would irreversibly harm Defenders' and their members' cognizable interests in the same manner described in previous declarations that accompanied Defenders' injunction requests. See Doc. 28-8 (William M. Gardner declaration); Doc. 28-9 (Bradley B. Shepard declaration).

## D. The Final EIS and ROD Do Not Undermine the Court's Rationale for the Findings on the Balance of the Harms and Public Interest

The agencies argue that the balance of the hardships and public interest favor immediate dissolution of the injunction, primarily because "[c]ontinued injunctive relief will delay reliable passage at the weir and this delay will harm pallid sturgeon." Doc. 101 at 16. This argument fails for three reasons.

First, the agencies' argument that the pallid sturgeon "simply cannot tolerate further delay" (Doc. 16-17) ignores the fact that the <u>agencies</u> are responsible for the pallid sturgeon's dire situation, as this Court has previously recognized. <u>See</u> Doc. 73 at 16 ("Federal Defendants' position [regarding irreparable harm] fails to recognize that Federal Defendants' continued operation of the existing weir constitutes the reasons that pallid sturgeon cannot swim upriver."); <u>see id.</u> at 3 (noting that Reclamation has known since at least 1992 that its existing operation of Intake Dam violates the ESA). Especially where these agencies have expressly or at least tacitly admitted that their actions are violating the ESA in myriad ways—including by impeding the species' survival and recovery prospects—it would undermine the express purposes of the ESA and NEPA to let the agencies proceed with constructing a permanent dam without at least examining, as the Court required, whether and how this project will ensure that this species will no longer be jeopardized by the agencies' actions.

Second, the agencies' warnings about delay are based on the same unfounded presumption that the bypass channel will succeed that the Court rejected in its injunction order. As the Court explained:

> Federal Defendants caution against an injunction that will delay the construction of the bypass channel. Federal Defendants' argument presumes that pallid sturgeon will successfully navigate the bypass channel and successfully spawn upriver. As noted above, however, Federal Defendants have failed to conduct any analysis on the efficacy of the bypass channel at accomplishing this goal.

Doc. 73 at 17-18. Nothing has changed that would undermine these findings. Aside from repeatedly acknowledging in the Final EIS and ROD the speculative, untested, and unproven nature of the proposed bypass channel with respect to pallid sturgeon passage, those decision documents fail to actually evaluate whether and why the bypass channel will, in fact, succeed. Indeed, as explained above, the consensus of the peer review panel and other independent scientists is that this bypass channel is <u>not</u> likely to succeed or, at best, is based on faulty assumptions that are not grounded in scientific evidence.

Third, the agencies erroneously assume that if the Project is not built, Reclamation will continue authorizing the re-construction of Intake Dam each year and continue to block pallid sturgeon from swimming upstream. Doc. 101 at 16-17. But Reclamation's existing operations are patently illegal, and even the agencies recognize those operations must change. Doc. 101 at 16 ("There is no dispute that the existing Intake Dam must be modified to promote the survival and recovery of this species by allowing for sufficient drift distance"). In addition, contrary to the assertions in their motion, Federal Defendants are well aware that Defenders brought this lawsuit seeking modifications at both dams that provide for survival and recovery of the species—not merely a new analysis of the Project. <u>Cf.</u> Doc. 101 at 16-17 (agencies asserting that Defenders "approached this Court claiming that they were only interested in seeking a more robust analysis through

the EIS"). Thus, enjoining the Project—as the Court has already done—does not mean the pallid sturgeon will be extirpated; it means that Reclamation and the Corps must modify their dam operations to avoid that fate and finally bring their actions into compliance with federal law.

## II.     DEFENDERS' NEPA CLAIM IS NOT MOOT

Federal Defendants argue that the mere <u>existence</u> of the EIS and ROD renders Defenders' NEPA claim against the 2015 EA and FONSI moot, and, as a result, the injunction must be dissolved. Doc. 101 at 4-8. Federal Defendants' argument is misplaced.

As an initial matter, courts do not dissolve injunctions based on the existence of new decision documents that purportedly moot the underlying claim, as Federal Defendants suggest, but rather on whether those new documents actually remedy the errors giving rise to the injunction. <u>See</u> <u>supra</u> at 10-12. Indeed, courts have consistently resolved motions to dissolve injunctions without addressing the mootness doctrine. <u>See, e.g.</u>, <u>Native Ecosystems Council v. Krueger</u>, 2015 WL 5164994; <u>Friends of the Wild Swan</u>, 2014 WL 1347987; <u>Alliance for the Wild Rockies v. Kruger</u>, 15 F. Supp. 3d 1052, 1056 (D. Mont. 2014); <u>Alliance for the Wild Rockies v. Bradford</u>, 2013 WL 12134043, *2-4 (D. Mont. Aug. 20, 2013); <u>Conservation Cong. v. U.S. Forest Serv.</u>, 2016 WL 1162676, at *3 (E.D. Cal. March 24, 2016); <u>Lands Council</u>, 2014 WL 6629591. Because courts retain

jurisdiction over their injunctions—regardless of whether any underlying claims have purportedly become moot—courts need not reach the mootness question and instead apply the well-established injunction dissolution standard set forth above.[7]

Moreover, Federal Defendants never even set forth the proper standard for demonstrating mootness or make an effort to meet that standard. Although the agencies never acknowledge it, "[t]he party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." Forest Guardians v. Johanns, 450 F.3d 455, 461 (9th Cir. 2006) (citation omitted). "That burden is 'heavy'; a case is not moot where any effective relief may be granted." Id. (citation omitted) (emphasis in original).[8]

In Johanns, the Ninth Circuit concluded that a new agency decision superseding the challenged decision did not moot the original claim because the agency was engaged in a "continuing practice," the violations were likely to continue, and effective relief was available to "ensure that the Forest Service does

---

[7]    The agencies argue for dismissal of Defenders' NEPA claim only. This claim was the subject of Defenders' first motion for preliminary injunction. Doc. 28. As noted above, Defenders filed two preliminary injunction motions, encompassing claims 6-10, and the Court granted both motions.

[8]    The agencies inaccurately imply that Defenders bears the burden to demonstrate continuing jurisdiction in this context. The agencies rely on a case reciting a plaintiff's burden to demonstrate standing, which is not at issue here. Doc. 101 at 5 (citing S.D. Myers, Inc. v. City & Cnty. of S.F., 253 F.3d 461, 474 (9th Cir. 2001)).

not continue to fail" to meet its obligations under the ESA.  Id. at 461-62.  Here,

too, the agencies have approved the identical project that has already been

enjoined, the existing legal violations continue, and effective relief is plainly

available because it is currently in place and must remain in place to prevent

irreparable injury to the species and Defenders' interests in it during the pendency

of the litigation.  Although some of Defenders' claims will be slightly reconfigured

in light of the new documents, the underlying controversy between the parties

remains essentially the same and is most assuredly not moot.  Hence, given that the

agencies approved the same Project and again failed to conduct the statutorily

required analyses, the existence of a new decision does not undermine the need for

the injunction until the Court can fully adjudicate this case.

## III.    THE AGENCIES' RUSH TO DISSOLVE THE INJUNCTION IS UNWARRANTED AND WOULD EFFECTIVELY PRECLUDE FULL JUDICIAL REVIEW OF THIS PROJECT BEFORE WORK IS COMMENCED

The agencies request that the injunction be dissolved by April 15 to avoid

delaying the completion of the Project and to ensure that the Corps does not lose

dedicated funding for at least the first year of the Project.[9]  Doc. 101 at 11-14.  The

_____

[9]      It is not at all clear that the entire Project will be funded regardless of when
the Project starts.  The Project is expected to be constructed over three years (Doc.
104-3 at 4-161 – 4-162), and Mr. Ponganis indicated continued funding for the
second and third years is likely, but not certain.  ECF 101-3 ¶ 9 ("Once project
construction has been initiated, the addition of funding in future fiscal years to
ensure project completion has been very successful historically.").

agencies' concern about losing funding is similar to those raised in 2015 in opposition to Defenders' preliminary injunction motions; those concerns were never realized.  See Doc. 46 at 15; Doc. 46-4 at ¶16.  At that time, Tiffany Vanosdall, Senior Project Manager/Lead Plan Formulator for the Corps, stated that while the Corps had budgeted $20 million out of Missouri River Recovery Program funds for Fiscal Year (FY) 2015, "[a]dditional funding to complete construction in FY 2016 and FY 2017 is dependent upon the start of construction in FY 2015."  Doc. 46-4 ¶16 (emphasis added).  Ms. Vanosdall also stated in 2015 that "[i]f the funds are not obligated for the Project in FY 2015, it is uncertain whether they will be available for the Project in future years.  It is possible the Corps may reprogram these funds to meet funding requirements on other critical projects if construction does not begin in FY 2015."  Id.  This concern turned out to be unwarranted, as Mr. Ponganis's declaration in support of the agencies' instant motion makes clear.  Doc. 101-3 ¶ 9 ("nearly $20 million in funding from fiscal year 2015 has been obligated to initiate work on this project, but not yet spent because of the preliminary injunction which prevented the issuance of a notice to proceed").

More importantly, the agencies' rush to green-light this Project severely prejudices Defenders' interests by significantly limiting, or even foreclosing, the opportunity to obtain judicial review of the merits of this Project before the notice

to proceed is issued and, potentially, before construction is commenced.  Cf. Lands

Council, 2014 WL 6629591, at *5-6 (concluding that injunction dissolution is

appropriate in part because it would not prejudice plaintiffs' ability to challenge

new agency decisions).  For that reason, should the Court grant the agencies'

instant motion, Defenders anticipates it would be forced to seek preliminary

injunctive relief based on its forthcoming claims against the 2016 approvals of the

Project, in order to preserve its ability to obtain effective relief after full resolution

of the merits.  Such a result would continue the pattern of piecemeal, preliminary

review of this Project that has been created entirely by the agencies' desired

timelines.  It would also again deprive Defenders and the Court of an adequate

opportunity to brief and resolve the merits of this case in a way that will ensure

that pallid sturgeon survive and recover and that the agencies bring themselves into

compliance with federal environmental laws.[10]

There is a reasonable path forward that is far more consistent with judicial

economy and efficiency.  As previously stated, upon receipt of a complete

administrative record, Defenders anticipates briefing the merits of its new claims

---

[10]     Given the agencies' purported need for a decision by April 15, it is
perplexing that they chose to wait until February 1 to file the instant motion—more
than three months after the agencies released the Final EIS and two months after
they issued the ROD.  The agencies' significant delay is yet another reason why
this Court should decline to dissolve the injunction, especially because Defenders
is willing to commence expedited merits briefing soon after the agencies lodge the
administrative record.

against the 2016 approvals of the Project and will do so on an expedited basis for the benefit of the species. Doc. 92. Proceeding along such a track would ensure that no work is commenced on a Project that is both illegal and highly likely to cause irreparable harm to the pallid sturgeon prior to full judicial review.

## CONCLUSION

For the reasons set forth above, Defenders respectfully request that this Court deny the agencies' Motion for Partial Dismissal and to Dissolve the Preliminary Injunction.

Respectfully submitted this 22nd day of February, 2017.

   /s/*McCrystie Adams*

McCrystie Adams (CO Bar # 34121)
Defenders of Wildlife
535 16th Street, Suite 310
Denver, CO 80202
(720) 943-0459
madams@defenders.org

   /s/*William S. Eubanks II*

William S. Eubanks II
William S. Eubanks II (CO Bar #49410)
Meyer Glitzenstein & Eubanks LLP
2601 S. Lemay Avenue
Unit 7-240
Fort Collins, CO 80525
(970) 703-6060
beubanks@meyerglitz.com

   /s/*Michelle Uberuaga*

Michelle Uberuaga (MT Bar #11611)
Law Office of Michelle Uberuaga Z., PLLC
P.O. Box 711
Livingston, MT 59047
(406) 223-4714
michelle.uberuaga@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served today via the Court's CM/ECF system on all counsel of record.

  _/s/McCrystie Adams_

McCrystie Adams

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I hereby certify that the foregoing brief contains 6,400 words, as determined by the word count function of Microsoft Word 2010.

  _/s/McCrystie Adams_

McCrystie Adams