IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE, and NATURAL RESOURCE DEFENSE COUNCIL<br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; UNITED STATES BUREAU OF RECLAMATION; and UNITED STATES FISH AND WILDLIFE SERVICE,<br>Defendants<br><br>and<br><br>LOWER YELLOWSTONE IRRIGATION PROJECT BOARD OF CONTROL, SAVAGE IRRIGATION DISTRICT, and INTAKE IRRIGATION DISTRICT<br>Defendant-Intervenors. | CV-15-14-GF-BMM<br><br><br>**ORDER REGARDING DEFENDANTS' MOTION FOR PARTIAL DISMISSAL AND TO DISSOLVE THE PRELIMINARY INJUNCTION; PLAINTIFFS' MOTION FOR LEAVE TO FILE A FOURTH SUPPLEMENTAL AND AMENDED COMPLAINT; AND PLAINTIFFS' MOTION FOR LEAVE TO FILE SURREPLY** |

## I.  Background

The United States Fish and Wildlife Service (FWS) listed pallid sturgeon as endangered in 1990. 55 Fed. Reg. 36, 641. The Missouri River between the Fort Peck Dam and Lake Sakakawea contains the largest wild pallid sturgeon population. Fewer than 125 wild pallid sturgeons remain and the population

1

appears in decline. (BOR 560; BOR 2216). The presence of the Fork Peck Dam on the Missouri River and the Intake Dam on the Yellowstone River account, in large part, for this decline. (BOR 567-572). The Intake Dam sits approximately 70 miles upriver from the confluence of the Yellowstone River and the Missouri River. These two barriers prevent the pallid sturgeon from swimming far enough upriver to spawn successfully.

After spawning, the pallid sturgeon larvae drift while they are developing. (BOR 568). The drift ranges from 152 to 329 miles. (BOR 568). Pallid sturgeons suffer very low survival rates in a lake environment, such as Lake Sakakawea, due to low oxygen levels. (BOR 2213). Larvae hatched below the Intake Dam lack sufficient "drift distance" to develop before they reach Lake Sakakawea. They perish as a result. (BOR 2212-13). If pallid sturgeon could spawn upstream of the Intake Dam, the larvae may develop sufficiently before they reached Lake Sakakawea that they would be able to swim to remain in the more hospitable river environment.

A wood structure topped with rocks along the crest forms the Intake Dam. The existing weir requires nearly annual replacement of rocks on the crest to hold back sufficient water to service irrigation needs. The United States Bureau of Reclamation ("Bureau") and the United States Army Corps of Engineers ("the Corps") intend to spend $59 million to replace the existing wood and rock weir at

2

Intake Dam with a concrete weir in order to ensure continued irrigation water to the 56,800 acres currently serviced by Intake Dam. (The "Project"). (BOR 2158; Doc. 30 at 3).

Five pallid sturgeons successfully used a natural side channel around the existing weir in 2014 during unusually high water. (BOR 2212). Federal Defendants decided that a new bypass channel, which would have sufficient flow all the time, provided the best option to allow pallid sturgeon to navigate around the weir. Federal Defendants issued an Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) in 2015. (BOR 2053-2636).

Plaintiff Defenders of Wildlife ("Defenders") filed the Complaint initiating this action during February of 2015. (Doc. 1.) Defenders ultimately filed a Third Supplemental and Amended Complaint that currently constitutes the operative set of claims in this action. (Doc. 52.) Defenders filed a Motion for Preliminary Injunction on July 28, 2015, to seek an injunction preventing Federal Defendant agencies ("Federal Defendants") from initiating construction on the project and ordering Federal Defendants to complete an Environmental Impact Statement (EIS). (Doc. 53.) The Court conducted a hearing on August 27, 2015. (Doc. 71.)

The Court granted Defenders' Motion for Preliminary Injunction on September 4, 2016. (Doc. 73.) The Court determined that Defenders' claim warranted a preliminary injunction on the basis that Federal Defendants had failed

to complete a full Environmental Impact Statement ("EIS") and the attendant analysis. The Court specifically emphasized the need for Federal Defendants to analyze recovery of pallid sturgeon and whether the project would prevent recovery. The Court also clearly identified the need for Federal Defendants to analyze whether the project would be successful in providing passage past the dam for pallid sturgeon.

Federal Defendants completed an EIS on October 21, 2016, and issued a Record of Decision ("ROD") on December 2, 2016, in response to the Court's order. (Doc. 101 at 9.) Federal Defendants filed the instant Motion for Partial Dismissal and to Dissolve the Injunction on February 1, 2017. (Doc. 100.) Federal Defendants seek to dismiss Count 6 in Defenders's Third Supplemental and Amended Complaint. (Doc. 101 at 9-13.) Federal Defendants also seek to dissolve the Court's prior injunction. *Id.* at 13-22. Federal Defendants sought to have the preliminary injunction dissolved by April 15, 2017, in order to begin construction this year and to protect the funding that was set aside for the project. (Doc. 101 at 16.) The Court takes into account this urgency in reaching its decision.

Defenders have filed a Motion for Leave to File a Fourth Supplemental and Amended Complaint in order to update its claims to incorporate the 2016 EIS and 2016 ROD. (Doc. 106.) Defenders also have filed a Motion for Leave to File Surreply in response to arguments newly raised in Federal Defendants' Reply Brief

for their Motion for Partial Dismissal and to Dissolve the Preliminary Injunction. (Doc. 113.)

## II.  Standard of Review for Dissolution of an Injunction

Federal Defendants' desire to dissolve the preliminary injunction requires the most substantial analysis from the Court. The Court accordingly dedicates the large majority of this Order to that portion of Federal Defendants' motion. A court that issues an injunction posseses "continuing jurisdiction to terminate, dissolve, vacate, or modify an injunction or an interlocutory order in the event that changed circumstances require it," *Univ. of Haw. Prof'l Assembly v. Cayetano*, 125 F. Supp. 2d 1237, 1240 (D. Haw. 2000), citing *United States v. Oregon*, 769 F.2d 1410, 1416 (9th Cir. 1985). The party requesting dissolution bears the burden of demonstrating that a significant change in the facts or the law of the case at issue has occurred. *All. for Wild Rockies v. Kruger*, 15 F. Supp. 3d 1052, 1054 (D. Mont. 2014). A significant change within the meaning of this standard pertains to a change regarding "the underlying reasons for the injunction." *Moon v. GMAC Mortg. Corp.*, 2008 WL 4741492, at *2 (W.D. Wash. Oct. 24, 2008).

## III.  Motion to Dissolve the Preliminary Injunction and for Partial Dismissal

Federal Defendants argue that the Court should dissolve the injunction on the basis that the 2016 EIS and 2016 ROD remedy "the issues identified by the Court in its preliminary injunction order." (Doc. 101 at 15.) Federal Defendants

contend that the issuance of these documents constitutes a significant change in facts regarding the underlying reasons for the Court's preliminary injunction Order. Federal Defendants accordingly reason that the Court should dissolve the preliminary injunction.

a.  Recovery

Federal Defendants assert that the 2016 EIS and 2016 ROD adequately address the Court's concern at the absence of a recovery analysis in the 2015 EA. (Doc. 109 at 3-6.) Federal Defendants claim that the Court's preliminary injunction Order emphasized two cases in making its determination that Federal Defendants must perform a recovery analysis—*Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917 (9th Cir. 2008) (*NWF*), and *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059 (9th Cir. 2004). Doc. 109 at 4, citing Doc. 73 at 10.

Federal Defendants claim that *NWF* and *Gifford Pinchot* address the need for Biological Opinions ("BiOps") prepared under the Endangered Species Act ("ESA") to include recovery analyses. (Doc. 109 at 4.) Federal Defendants represent that the Fish and Wildlife Service has included a recovery analysis for the pallid sturgeon in the new 2016 BiOp. Doc. 109 at 4, citing Doc. 103-2 at 8-9, 11-13. Federal Defendants further assert that their 2016 EIS incorporates and relies upon the BiOp's recovery analysis. Doc. 109 at 4, citing Doc. 101-1 at 23. Federal

Defendants reason that the EIS's incorporation of the BiOp's recovery analysis addresses the Court's concern in relation to *NWF* and *Gifford Pinchot*.

The Court cited *NWF* in its preliminary injunction order for the proposition that courts need not "defer to an agency's decision to prepare an EA when the agency failed to consider the 'recovery' portion of the ESA." (Doc. 73 at 10.) The Court was determining the adequacy of the Federal Defendants' 2015 EA in the preliminary injunction order. The Court cited *NWF* to support its determination that NEPA required the Federal Defendants to prepare an EIS on the basis that the EA had failed to include a recovery analysis. The absence of this analysis rendered it impossible for the Court to determine whether NEPA required preparation of an EIS. *Id.* at 11. The Court made its intention clear by discussing the standard for preparing an EIS over an EA in the paragraph immediately following the *NWF* and *Gifford Pinchot* discussion. *Id.* at 10. Federal Defendants now have prepared an EIS in an attempt to remedy the Court's concerns.

The Court relied upon *Gifford Pinchot* to establish the Court's authority to reject an agency action when the BiOp focuses "on survival to the exclusion of any recovery analysis." *Id. Gifford Pinchot* supports the proposition that an agency can and must analyze recovery in a BiOp. *Gifford Pinchot*, 378 F.3d at 1070. The Court explicitly stated that "[t]he anticipated success analysis" of the project "would incorporate the 'recovery' portion of the ESA described in [*NWF*] and

7

[*Gifford Pinchot*].” *Id.* at 11. The Court contemplated that Federal Defendants would perform a recovery analysis within a new BiOp and incorporate that analysis in an EIS.

Federal Defendants have failed to incorporate explicitly the BiOp's recovery analysis in the 2016 EIS or 2016 ROD. Federal Defendants refer to an alleged incorporation of, and reliance on, the BiOp in the 2016 ROD. (Doc. 109 at 4, citing Doc. 101-1 at 23.) Federal Defendants' citation proves inaccurate, however, as no explicit incorporation can be found on the page cited in the ROD. (Doc. 101-1 at 23.) The cited page informs that the Bureau and the Corps requested formal consultation under Section 7 of the ESA with FWS on August 29, 2016. The ROD further provides that FWS completed the BiOp on November 18, 2016. The ROD finally states that the Bureau and the Corps would implement "the non-discretionary mitigation measures" listed in the BiOp "in compliance with the Incidental Take Statement." (Doc. 101-1 at 23.)

The cited language strikes the Court as something less than an explicit incorporation of, or reliance on, the BiOp. The explicit incorporation of, or reliance on, the BiOp likely would have satisfied the Court's order on the Preliminary Injunction. *Gifford Pinchot*, 378 F.3d at 1070. The Court now instead must determine whether implicit incorporation of an adequate recovery analysis exists in

8

the 2016 ROD or 2016 EIS. In the alternative, the Court will assess whether an adequate recovery analysis exists in full form in either of these documents.

The Fish and Wildlife Service (FWS) identified in the BiOp that the Project comports with FWS's "recovery plan goal[] of improving passage." (Doc. 103-2 at 8-9 and Doc. 102-2 at 7.) FWS determined that pallid sturgeon need passage in order to recover and need to spawn high enough in the Yellowstone River basin to allow sufficient drift distance. (Doc. 103-2 at 11-12.) FWS posited that spawning habitat exists above the intake dam that would allow for sufficient drift distance. *Id.* at 12. FWS concluded that successful passage above the dam would cause a population response conducive to recovery. *Id.* at 5. The BiOp contains an adequate recovery analysis that contemplates the project.

The 2016 ROD implicitly incorporates the recovery analysis. The ROD provides that "[t]he current design of the bypass channel includes a review of information on the swimming ability of the pallid sturgeon, performance of other fish bypass channels, potential causes for bypass channel failures, and use of side channels for upstream movement." (Doc. 101-1 at 21.) The 2016 ROD also repeats the BiOp by stating that "passage will increase the potential for recruitment and thus recovery." *Id.* at 22. The 2016 ROD deduces that the project "may increase the chances of natural recruitment and contribute to meeting recovery goals as defined in the Pallid Sturgeon Recovery Plan." *Id.*

b.  Success of the Bypass Channel

Federal Defendants also incorporated recovery analysis in their deduction of whether the project successfully would precipitate fish passage above the dam. This type of analysis represents the remedy that the Court contemplated in its preliminary injunction order. Federal Defendants state in the 2016 EIS that, taking into account all analysis, "the Bypass Channel Alternative is likely to provide a significant improvement in fish passage." (Doc. 104-1 at 200.) This theory, if supported by evidence, incorporates the primary finding of the recovery analysis—that fish passage above the dam provides the greatest chance at recovery. Federal Defendants in support of this finding cite to tracking of radio telemetered wild adult pallid sturgeon as they have encountered the existing intake dam. *Id.* The telemetering has shown that the pallid sturgeon explore around the dam "and move both downstream and back upstream, indicating they may be searching for a passageway" around the dam. *Id.*

Federal Defendants also studied other fish bypass channels in making their conclusion that pallid sturgeon are likely to use the proposed bypass channel. (Doc. 104-3 at 287-88.) Federal Defendants analyzed the Glen-Colusa constructed gradient facility (riffle) on the Sacramento River. The riffle was built for passage of green sturgeon. Federal Defendants claim that a three-year monitoring study of the riffle demonstrated that 12 to 50 percent of the tagged fish successfully

10

migrated upstream past the riffle. Federal Defendants further contend that this number reflects a conservative estimate that likely deflated the actual number due to the occurrence of the study at the end, or after, the spawning season.

Federal Defendants additionally analyzed the successes and failures of the Muggli Bypass Channel on the Tongue River in Montana. *Id.* Federal Defendants note that the Muggli Bypass successfully has passed "many native migratory fish species," but has failed to pass the shovelnose sturgeon. The Federal Defendants have analyzed the nonfunctionality of the Muggli Bypass in relation to the shovelnose sturgeon to glean technical knowledge for the bypass at issue. Federal Defendants note that they specifically have used the Muggli Bypass to inform velocity levels, attraction flows, and elevation and texture of the channel bed.

FWS further researched the probability that pallid sturgeon would use the bypass by observing the existing highwater channel, analyzing studies of swimming pallid sturgeon in artificial flumes, and deducing that the bypass had been carefully designed. (Doc. 103-1 at 14.) FWS thereby concluded that "it is expected that fish cued to move up the river to spawn, if they encounter the replacement weir, will find the bypass channel and move upstream." *Id.* Federal Defendants' 2016 ROD implicitly incorporates this analysis when it outlines that Federal Defendants considered studies on pallid sturgeon swim patterns and

previous use of the highwater channel, among other things, in determining its final design of the bypass channel. (Doc. 101-1 at 21.)

Defenders contend that Federal Defendants failed to analyze meaningfully the success of the bypass channel. Defenders specifically claim that NEPA and the Court's preliminary injunction order required Federal Defendants to conduct a comprehensive study that would have assessed quantitatively the potential for upstream passage for pallid sturgeon for each project alternative. (Doc. 105 at 23.) Defenders claim that the Court cannot dissolve the injunction until Federal Defenders resolve this requirement.

The Ninth Circuit in *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 628 (9th Cir. 2014), rejected the district court's concerns that FWS had produced "a more subjective, qualitative analysis." The Court in *San Luis* reviewed a BiOp for the Delta Smelt, which is a listed species under the ESA. FWS omitted a statistical study regarding predator-prey relations of delta smelt. The Court concluded that FWS's failure to include the statistical study "because it did not have sufficient data to justify it does not strike us as a 'results-driven choice,' but as responsible science." *Id.* at 629. The Court further expounded that "even if [it] thought a 'rigorous, large-scale study . . . would be preferable,' [it had] no authority to compel one: 'in the absence of such a study,' even 'credible anecdotal

12

evidence' can 'represent[] the best scientific . . . data available.'" *Id.*, citing *Nw.*
*Ecosystem Allaince v. FWS*, 475 F.3d 1136, 1147 (9th Cir. 2007).

The Court similarly must compare the NEPA documents Federal
Defendants have produced to the standards set forth in NEPA, regardless of the
Court's preference in terms of analysis. NEPA standards represent a lower bar than
FWS faced in *San Luis*, as the ESA provided the best available science standard in
that case. NEPA merely requires that information provided by the agencies be "of
'high quality' and professional integrity." Implementation of the National
Environmental Policy Act (NEPA) of 1969, 73 Fed. Reg. 61292, 61299 (Oct. 15,
2008), citing 40 C.F.R. 1500.1, 1502.24.

The Court accordingly recognizes that "NEPA is not a crystal ball." (Doc.
109 at 10.) NEPA does not require Federal Defendants to make a quantitative
assessment of each alternative's probability of success when Federal Defendants
lack data to make those assessments. Federal Defendants' analysis of pallid
sturgeon behavior when approaching the dam, analysis of other fish passages, and
careful study of pallid sturgeon swim patterns in flumes and the highwater side
channel, satisfy the Court that the Federal Defendants have attempted to provide
the best available information. The Court lacked the authority to require anything
more in its preliminary injunction order. Federal Defendants' 2016 documents
necessarily resolve the concerns the Court expressed in that order.

## c. Conclusion on Motion to Dissolve the Injunction

Federal Defendants have remedied the deficiencies the Court highlighted in its preliminary injunction order. Federal Defendant's 2016 EIS and 2016 ROD have attempted to address adequately pallid sturgeon recovery and probability of success of the bypass channel under NEPA. The Court will accordingly dissolve its preliminary injunction.

## d. Motion for Partial Dismissal

Federal Defendants seek a dismissal of Claim Six in Defenders's Third Supplemental and Amended Complaint. (Doc. 100.) Claim Six constitutes Defenders's currently operative NEPA claims. (Doc. 52.) Federal Defendants assert that the 2016 EIS and 2016 ROD supersede the EA and FONSI that it previously had completed for the project. Federal Defendants contend that Claim 6 proves moot on the basis that it represents Defenders's challenge to the now superseded EA and FONSI. (Doc. 101 at 11-12.)

Federal Defendants argue that the Ninth Circuit has held that superseding administrative actions, such as the new NEPA documents at issue, moot claims regarding superseded actions. Doc. 101 at 10-11, citing *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1017 (9th Cir. 2012), *as amended* (Sept. 17, 2012). Federal Defendants cite *Grand Canyon* and a myriad of other

cases for the proposition that challenges to a prior BiOp prove moot when a new BiOp has been issued. *Id.*

The parties do not dispute that the 2016 EIS and 2016 ROD have superseded the prior EA and FONSI. Ninth Circuit case law counsels that any claims based on the superseded EA and FONSI now prove moot. *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997); *Grand Canyon Trust*, 691 F.3d at 1017. Claim 6 of Defenders's Third Supplemental and Amended Complaint constituted a challenge to the superseded EA and FONSI. The Federal Defendants' preparation of the 2016 EIS and 2016 ROD renders Claim 6 moot.

## IV. Motion for Leave to File Fourth Supplemental and Amended Complaint

Defenders seek leave to file a fourth supplemental and amended complaint. (Doc. 106.) Defenders seek to update their claims to incorporate the 2016 EIS and 2016 ROD. (Doc. 107 at 2.) Defenders assert that Rule 15(d) of the Federal Rules of Civil Procedure allows a plaintiff to "'to serve a supplemental pleading setting out any transaction, occurrence or event that happened after the date of the pleading to be supplemented.'" *Id.* at 8, citing Fed. R. Civ. P. 15(d).

Defenders point to *Keith v. Volpe*, 858 F.2d 467, 471 (9th Cir. 1988), for the proposition that the Court should wield Rule 15(d) "to permit expansion of the scope of existing litigation to include events that occur after filing of the original complaint." (Doc. 107 at 8.) The court in *San Luis & Delta-Mendota Water*

*Authority v. U.S. Dep't of Interior*, 236 F.R.D. 491, 501 (E.D. Cal. 2006), also recognized that granting leave to supplement a complaint proves appropriate when the proposed amendment represents a "discrete and logical extension of the original claims in the case." (Doc. 107 at 8-9.)

The fourth supplemental and amended complaint proposed by Defenders represents a logical outgrowth of the claims contained in the Third Supplemental and Amended Complaint. The fourth supplemental and amended complaint would allow Defenders logically to expand the scope of this litigation to include new documents that have been produced since the filing of the Third Supplemental and Amended Complaint. The Federal Defendants produced these new documents—the 2016 EIS and 2016 ROD—in response to the Court's order granting the preliminary injunction. The Court accordingly concludes that Fed. R. Civ. P. Rule 15(d) supports granting Defenders leave to file a fourth complaint.

The Court emphasizes that granting Defenders leave to amend means that Defenders' challenge of the project remains viable. Defenders' new Complaint will require the Court to address potentially meritorious claims under the Clean Water Act, the ESA, and NEPA. Defenders' ESA and CWA claims involve different, and in the case of the ESA, more stringent, standards in terms of required scientific analysis. Federal Defendants should consider at this stage of the proceedings the potential risk of a future preliminary injunction pursuant to these claims.

16

## V. Motion for Surreply

Defenders seek leave to file a surreply in response to Federal Defendants' Reply with respect to the Motion for Partial Dismissal and to Dissolve the Injunction. (Doc. 113.) This motion now proves moot on the basis that the Court presently grants the Federal Defendants' underlying motion.

Accordingly, IT IS ORDERED:

Federal Defendants' Motion for Partial Dismissal and to Dissolve the Preliminary Injunction (Doc. 100), is **GRANTED**.

Defenders's Motion for Leave to File a Fourth Supplemental and Amended Complaint (Doc. 106), is **GRANTED**.

Defenders's Motion for Leave to File Surreply (Doc. 113), is **DENIED**.

Dated this 19th day of April, 2017.

Brian Morris
United States District Court Judge