

FILED

JUL 0 5 2017

Clerk, U.S. District Court
District Of Montana
Great Falls

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

| | |
|---|---|
| DEFENDERS OF WILDLIFE, and NATURAL RESOURCE DEFENSE COUNCIL<br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; UNITED STATES BUREAU OF RECLAMATION; and UNITED STATES FISH AND WILDLIFE SERVICE,<br>Defendants<br><br>and<br><br>LOWER YELLOWSTONE IRRIGATION PROJECT BOARD OF CONTROL, SAVAGE IRRIGATION DISTRICT, and INTAKE IRRIGATION DISTRICT<br>Defendant-Intervenors. | CV-15-14-GF-BMM<br><br><br>**ORDER REGARDING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## I.  BACKGROUND

The United States Fish and Wildlife Service (FWS) listed pallid sturgeon as

endangered in 1990. 55 Fed. Reg. 36, 641. The Missouri River between the Fort

Peck Dam and Lake Sakakawea contains the largest wild pallid sturgeon

population. Fewer than 125 wild pallid sturgeons remain and the population

appears in decline. (BOR 560; BOR 2216). The presence of the Fork Peck Dam on the Missouri River and the Intake Dam on the Yellowstone River account, in large part, for this decline. (BOR 567-572). The Intake Dam sits approximately 70 miles upriver from the confluence of the Yellowstone River and the Missouri River. These two barriers prevent the pallid sturgeon from swimming far enough upriver to spawn successfully.

Two decades of testing and analysis apparently have persuaded the Federal Defendants that no amount of tinkering with the operation can overcome the insurmountable barrier to pallid sturgeon spawning posed by the Fort Peck Dam. As a result, the Federal Defendants have turned all of their efforts required by the Endangered Species Act ("ESA") to the Intake Dam and the farmers currently served by the irrigation water provided by it.

After spawning, the pallid sturgeon larvae drift while they are developing. (BOR 568). The drift ranges from 152 to 329 miles. (BOR 568). Pallid sturgeons suffer very low survival rates in a lake environment, such as Lake Sakakawea, due to lower oxygen levels. (BOR 2213). Larvae hatched below the Intake Dam lack sufficient "drift distance" to develop before they reach Lake Sakakawea. They perish as a result. (BOR 2212-13). If pallid sturgeon could spawn upstream of the Intake Dam, the larvae would have the opportunity to develop sufficiently before they reached Lake Sakakawea. This extra development time likely would render

2

the pallid sturgeon able to swim to remain in the more hospitable river environment.

A wood structure topped with rocks along the crest forms the Intake Dam. The existing weir requires nearly annual replacement of rocks on the crest to hold back sufficient water to service irrigation needs. The United States Bureau of Reclamation ("Bureau") and the United States Army Corps of Engineers ("the Corps") intend to spend $59 million to replace the existing wood and rock weir at Intake Dam with a concrete weir in order to ensure continued irrigation water to the 56,800 acres currently serviced by Intake Dam. (The "Project"). (BOR 2158; Doc. 30 at 3).

Five pallid sturgeons successfully used a natural side channel around the existing weir in 2014 during unusually high water. (BOR 2212). Federal Defendants decided that a new bypass channel, which would have sufficient flow all the time, provided the best option to allow pallid sturgeon to navigate around the weir. Federal Defendants issued an Environmental Assessment and Finding of No Significant Impact in 2015. (BOR 2053-2636).

Plaintiff Defenders of Wildlife filed the Complaint to initiate this action in February of 2015. (Doc. 1.) Plaintiff filed a Motion for Preliminary Injunction on July 28, 2015, to enjoin Federal Defendant agencies ("Federal Defendants") from initiating construction on the project and ordering Federal Defendants to complete

an Environmental Impact Statement (EIS). (Doc. 53.) The Court conducted a

hearing on August 27, 2015. (Doc. 71.)

The Court granted Plaintiff's Motion for Preliminary Injunction on

September 4, 2015. (Doc. 73.) The Court determined that Plaintiff's claim

warranted a preliminary injunction on the basis that Federal Defendants had failed

to complete a full EIS and the attendant analysis. The Court specifically

emphasized the need for Federal Defendants to analyze recovery of pallid sturgeon

and whether the project would prevent recovery. The Court also clearly identified

the need for Federal Defendants to analyze whether the project would be

successful in providing passage past the Intake Dam for pallid sturgeon.

Federal Defendants completed an EIS on October 21, 2016, and issued a

Record of Decision ("ROD") on December 2, 2016, in response to the Court's

order. (Doc. 101 at 9.) Federal Defendants filed a Motion for Partial Dismissal and

to Dissolve the Injunction on February 1, 2017. (Doc. 100.) Federal Defendants

sought to dismiss Count 6 of Plaintiff's Third Supplemental and Amended

Complaint. (Doc. 101 at 9-13.) Federal Defendants also sought to dissolve the

Court's prior injunction. *Id.* at 13-22. The Court held a hearing on the Motions for

Partial Dismissal and to Dissolve the Injunction on April 5, 2017, and subsequently

issued an Order granting Federal Defendants' motion and granting Plaintiff's

4

Motion for Leave to file a Fourth Supplemental and Amended Complaint. (Doc. 117, 118.)

The Court reasoned that Federal Defendants' new National Environmental Policy Act ("NEPA") decisional documents—the 2016 EIS and the 2016 ROD—sufficiently corrected the Federal Defendants' NEPA violations at the heart of the original preliminary injunction. (Doc. 118.) Plaintiff filed a Fourth Supplemental and Amended Complaint that incorporated challenges to Federal Defendants' 2016 NEPA and Endangered Species Act ("ESA") documents on April 20, 2017. (Doc. 119).

Plaintiff brings its current Motion for Preliminary Injunction on the basis of claims 11-14 of the Fourth Supplemental and Amended Complaint. (Doc. 122.) Plaintiff seek a preliminary injunction that would halt the construction related to the Project and preserve the status quo until the parties can brief dispositive motions in an expedited schedule. (Doc. 122.) Plaintiff's Motion for Preliminary Injunction proves the more complex of the two pending motions. The majority of this Order will focus on the request for a preliminary injunction.

## II. LEGAL STANDARD

A plaintiff must demonstrate "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public

5

interest" in order to obtain a preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief constitutes an "extreme remedy" that never should be awarded as a matter of right. *Id.* at 22-24. A plaintiff need only show a likelihood of success on the merits and a likelihood of irreparable harm for ESA claims. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090-91 (9th Cir. 2015). Demonstrating a likelihood of irreparable harm on the basis of an ESA claim "should not be an onerous task for plaintiffs." *Id.* at 1091.

## III. ANALYSIS

The Court first must address the likelihood of success on the merits for claims under each relevant statute. The Court then will address Plaintiff's alleged irreparable harm to the pallid sturgeon generally. The Court finally will address the balance of equities and the public interest prongs of the analysis in relation to the NEPA and Clean Water Act ("CWA") claims.

### a.  Likelihood of Success on the Merits

Plaintiff's strongest and most complex claims fall under the ESA.

### 1.  ESA Claims

ESA Section 7(a)(2) provides that each federal agency shall "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species

6

or result in the destruction or adverse modification of habitat" of the species. 16 U.S.C. § 1536(a)(2). The consulting agency must prepare a biological opinion if it appears that an action may affect an endangered or threatened species. *Cottonwood Envtl. L. Ctr.* 789 F.3d at 1085.

The biological opinion should explain how the action "'affects the species or its critical habitat.'" *Id.* (quoting 16 U.S.C. § 1536(b)(3)(A)). The consulting agency must suggest "reasonable and prudent alternatives" when the biological opinion concludes that the action proves likely to jeopardize an endangered or threatened species. 16 U.S.C. § 1536(b)(3)(A). The consulting agency may proceed with the action if the biological opinion concludes that the action proves unlikely to jeopardize an endangered or threatened species. *Id.*

The Court reviews compliance with NEPA, CWA, and the ESA under the judicial process set forth in the Administrative Procedures Act ("APA"). 5 U.S.C. §§701-706; *Native Ecosystems Council v. Dembeck*, 304 F.3d 886, 891 (9th Cir. 2002). The decision may be set aside only when the court finds the agency's decision "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Oregon Nat. Resources Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). A final agency decision will be overturned only if the agency committed "clear error in judgment." *Marsh*, 490 U.S. at 378. Plaintiff asserts that Federal Defendants' 2016

7

pallid sturgeon BiOp violates the ESA and otherwise proves arbitrary and capricious. (Doc. 123 at 24.)

## A. Incidental Take Statement

Plaintiff argues that the 2016 BiOp unlawfully fails to evaluate the impact on pallid sturgeon from the level of take authorized in the Incidental Take Statement ("ITS"). *Id.* at 24-26. The ITS consists of a separate document governed by the ESA that shields the action agencies—in this case the Bureau of Reclamation and the Army Corps of Engineers—from take liability under Section Nine of the ESA. 16 U.S.C. § 1536(o). The meaning of "take" encompasses a wide range of activities toward an endangered animal, including the prevention of breeding at issue in this case. *Id.* at § 1532(19).

The ESA requires that the Fish and Wildlife Service provide an ITS with any BiOp that finds that no jeopardy will result from the relevant action. 50 C.F.R. § 402.14(i)(1). The ITS must contain an "anticipated take" limit, over which the action agencies must reinitiate Section Seven consultation under the ESA. 50 C.F.R. § 402.14(i)(4). The Fish and Wildlife Service can use a "surrogate" figure rather than an exact number of individuals to comprise the ITS take limit. 50 C.F.R. § 402.14(i)(1)(i). The Federal Defendants' ITS includes a take threshold of 59 percent of the adult pallid sturgeon that approach the Intake Dam each year. (Doc. 103-3 at 3.)

8

Plaintiff argues that Federal Defendants failed to analyze adequately the potential take of 59 percent of adult pallid sturgeon in their jeopardy analysis. (Doc. 123 at 24-26.) The ESA prevents the Fish and Wildlife Service from authorizing take at a level that would jeopardize the species. *Id.* at 24, citing 16 U.S.C. § 1536(b)(4). Plaintiff cites to *Sw. Ctr. for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1146-49 (S.D. Cal. 2006), to support its argument that the ESA requires the Fish and Wildlife Service to analyze the level of authorized take in the BiOp's jeopardy analysis.

The agencies in *Bartel* had authorized a level of 12 percent take of endangered vernal pool species. *Id.* at 1148. The court determined that the authorized take "warrant[ed] an explanation as to whether the vernal pool species [could] withstand this much loss." *Id.* The record fails to include any indication that Federal Defendants analyzed whether the pallid sturgeon could withstand a 59 percent loss level as contemplated by the ITS.

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1172 (E.D. Cal. 2008), stands for the same proposition. The agencies in *Pacific Coast* had conceded in the BiOp that the project at issue would take 30 percent of an endangered fish species. *Id.* at 1171. The court concluded that the BiOp violated the ESA on the grounds that it "conclusory mention[ed,]" but did not adequately explain, "how extirpation of approaching one-third of the species affected by

9

Project operations does not constitute jeopardy." *Id.* at 1172. The BiOp here

likewise fails to explain how possible extirpation of more than one-half of the

pallid sturgeon affected by the Project results in no jeopardy.

Federal Defendants have authorized through the ITS the take of 59 percent

of pallid sturgeon that approach the dam. (Doc. 103-3 at 3.) *Pacific Coast* and

*Bartel*, as well as the language of the ESA and its regulations, require the Fish and

Wildlife Service to have explained in its BiOp how a 59 percent take level of the

adult population of pallid sturgeon that approach the Intake Dam rationally can

coexist with a no jeopardy finding. Federal Defendants claim that they have

analyzed adequately the effects of 59 percent take in their jeopardy analysis, but

their citations prove unavailing. (Doc. 140 at 31-32.)

Federal Defendants provide two citations to the BiOp and two citations to

the ITS. The first BiOp citation merely describes the Service's reasoning for

choosing the 59 percent take figure and explains that the Service actually

anticipates more successful passage. NFWS0003137. The second BiOp citation

refers to the jeopardy finding without any reference to the 59 percent take

authorization. NFWS0003151. The two citations to the ITS explain the reasoning

behind choosing the 59 percent figure, and conclude, without explanation, that "the

described level of anticipated incidental take, is not likely to jeopardize . . . the

pallid sturgeon." NFWS0003155-56. These citations strike the Court as similar to

10

the "conclusory mention" of anticipated take in a jeopardy analysis that the court deemed inadequate in *Pacific Coast*. *Pacific Coast*, 606 F. Supp. 2d at 1172.

Federal Defendants' briefing on this motion and citations to the administrative record lead the Court to believe that they counter Plaintiff's ITS argument by claiming that fish passage will be more successful than the 59 percent take authorization reflects. NFWS0003137; NFWS0003155; Doc. 140 at 29-30. Federal Defendants seem to argue that the BiOp, as a result, would need not address fully the impacts of the 59 percent take. The court in *Bartel* rejected this argument.

*Bartel* determined that the authorized level of take represented the effect to be evaluated in the jeopardy analysis. Other take estimates put forth by the federal defendants proved irrelevant to the jeopardy analysis. *Bartel*, 470 F. Supp. 2d at 1148. Federal Defendants included the 59 percent take threshold as part of its ITS. Federal Defendants must analyze the effects from the Project on the pallid sturgeon based on this 59 percent take level.

It makes little sense as a policy matter for the Court to soften the Federal Defendants' jeopardy analysis requirements on the basis that the ITS included an overestimate of take. This type of determination would encourage agencies always to overestimate take in the ITS. This overestimate of take would excuse agencies from having to analyze in the jeopardy analysis the take actually authorized in the

11

ITS. This same overestimation of take in the ITS would give Federal Defendants a large exemption from Section 9 liability under the ESA.

Nothing in the administrative record analyzes the likely take of adult pallid sturgeon other than the 59 percent figure used in the ITS. Federal Defendants have failed to explain whether the pallid sturgeon could survive a 59 percent take rate. The ESA and the decisions in *Pacific Coast* and *Bartel* require the Federal Defendants to justify the expected survival of the pallid sturgeon in the face of a 59 percent take level developed in the ITS by Federal Defendants.

An overestimate of take also would allow Federal Defendants to delay reinitiation of consultation, which they would not be required to do until the 59 percent take metric had been surpassed. Federal Defendants must reckon with the Section 9 liability and reinitiation realities of a higher passage rate if they wish not to account rationally for a high take rate in their jeopardy analyzes. Plaintiff possesses the requisite likelihood of success on the merits on this ESA theory. *Bartel,* 470 F. Supp. 2d at 1146-49; *Pacific Coast,* 606 F. Supp. 2d at 1172.

## B. Survival and Recovery Analysis

Plaintiff argues that the BiOp unlawfully fails to assess the Project's impacts in the context of survival and recovery of the species. (Doc. 123 at 26-31.) Federal Defendants must analyze project impacts on survival and recovery of the species. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF I"),* 524 F.3d 917, 931

12

(9th Cir. 2008). Plaintiff asserts that this requirement necessarily forces Federal
Defendants to include a quantifiable recovery goal in the BiOp and explain how
the Project will impact that goal. (Doc. 123 at 27-28.)

Plaintiff cites to *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF
II")*, 184 F. Supp. 3d 861, 888 (D. Or. 2016), for the assertion that the ESA
requires a quantifiable recovery metric or goal. *NWF II* addressed the legality of
federal agencies' ESA analysis regarding dam operations on the Columbia River.
*Id.* at 869-70. Various salmon and steelhead species proved to be the endangered
species at issue. *Id.* at 869. The court in *NWF II* determined that a BiOp's reliance
on population growth impacts "not tethered to any minimum population goal"
violated the recovery analysis requirements of the ESA. *Id.* at 888.

The Ninth Circuit in *NWF I* similarly concluded that a no jeopardy
determination violated the ESA when the agency issued it "without knowing the
in-river survival levels necessary to support recovery" or "at what point survival
and recovery will be placed at risk." *NWF I*, 524 F.3d at 936. The Court agrees
with Plaintiff, the Ninth Circuit, and the District of Oregon in *NWF II* on this point.
The ESA requires Federal Defendants to identify a measurable benchmark for
recovery against which it could analyze impacts from the project. Federal
Defendants failed to include any benchmark in their analysis.

13

Federal Defendants claim that Plaintiff improperly seeks to import Section 4's Recovery Plan requirements into the Section 7 jeopardy analysis. (Doc. 140 at 35-36.) The Ninth Circuit reasoned in *NWF I*, however, that "requiring some attention to recovery issues does not improperly import ESA's separate recovery planning provisions into the section 7 consultation process." *NWF I*, 524 F.3d at 936. Plaintiff's lack of recovery analysis arguments strike the Court as covered by the ruling in *NWF I*.

Federal Defendants also cite to the Court's prior Order Dissolving the Preliminary Injunction to argue that the Court had deemed their recovery analysis adequate. (Doc. 140 at 34, citing Doc. 118 at 9.) The Order evaluated the recovery analysis under NEPA standards, however, rather than the more exacting standards of the ESA. Courts have developed more detailed, searching standards for recovery analysis under the ESA than under NEPA. *See, e.g., NWF II*, 184 F. Supp. 3d at 888; *NWF I*, 524 F.3d at 936.

Plaintiff further asserts that the BiOp violates the ESA by focusing solely on improvement from the status quo in its recovery analysis. (Doc. 123 at 28-30.) Plaintiff claims that mere improvement from the status quo fails to equate with the required demonstration that the Project will not appreciably reduce the likelihood of survival and recovery. *Id.* at 29. Plaintiff cites a multitude of cases for this assertion. *See, e.g., NWF II*, 184 F. Supp. 3d at 888. The Court in *NWF II* deemed

14

inadequate a jeopardy analysis on the grounds that it failed to "take into account whether populations remaining at significantly low abundance numbers, even though the populations may be growing incrementally, appreciably diminish the likelihood of recovery." *Id.* at 888; *see also Wild Fish Conservancy*, 628 F.3d at 527-28; *Aluminum Co. of Am. v. Adm'r Bonneville Power Admin.*, 175 F.3d 1156, 1162 n.6 (9th Cir. 1999) (determining that "the regulatory definition of jeopardy . . . does not mean that an action agency can stay the course just because doing so has been shown slightly less harmful to the listed species than previous operations.") (internal quotations omitted); *S. Yuba River Citizens League v. NMFS*, 723 F. Supp. 2d 1247, 1267 (E.D. Cal. 2010) (concluding that a biological opinion proved inadequate when it determined that the project would "partially reduce" impacts to a listed fish without analyzing whether the reduction would avoid causing jeopardy to the species).

The Ninth Circuit in *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527-28 (9th Cir. 2010), likewise determined that the agency's movement from "no migratory bull trout spawning successfully" to possibly very few spawning failed to support a no jeopardy conclusion. The agencies in *Wild Fish Conservancy* had produced a BiOp to address the effects of the operations of a fish hatchery on the bull trout. *Id.* at 516. The fish hatchery almost completely blocked upstream passage for bull trout, though in a way that represented an improvement from prior

hatchery operations. *Id.* at 528. The agencies inexplicably determined that the continued negative population trend of the bull trout posed by the hatchery could improve the overall species's chances for survival. *Id.* The Ninth Circuit determined that this finding proved unlawful. *Id.* at 529.

The Court agrees that Federal Defendants failed to provide sufficient information to demonstrate that the Project will improve a situation that they concede to be dire. (Doc. 102-3 at 6.) Federal Defendants must analyze whether the Project sufficiently will improve the pallid sturgeon's plight to give it a chance at survival and recovery. Plaintiff possesses the requisite likelihood of success on the merits on this ESA theory. *NWF II*, 184 F. Supp. at 888; *Wild Fish Conservancy*, 628 F.3d at 527-28; *NWF I*, 524 F.3d at 936.

### C. Best Available Science

Plaintiff lastly argues that the Federal Plaintiff failed to use the best available science in producing the BiOp. (Doc. 123 at 31-37.) The ESA requires Federal Defendants to use the best available science in their jeopardy analysis. 16 U.S.C. § 1536(a)(2). Plaintiff argues that Federal Defendants have failed to use the best available science in three distinct ways: (1) Federal Defendants have not provided a basis for their 85 percent passage target; (2) the BiOp's admitted uncertainty about passage success fatally undermines its no jeopardy finding; and

16

(3) the no jeopardy conclusion fails to take into account the continued existence and operation of Fort Peck Dam on the Missouri River. (Doc. 123 at 31-37.)

Plaintiff first argues that the evidence fails to support the 85 percent fish passage expectation in the BiOp, to the extent that Federal Defendants relied on this figure in their jeopardy analysis. *Id.* at 33. Plaintiff refers to a section of the BiOp that states that the Service's Biological Review Team "set an expectation that the channel will pass 85% of the spawning adults that move up to the weir." NFWS0003137. Plaintiff cites to multiple comments from the peer review panel commissioned by the Corps and other groups that express substantial doubt that fish passage will occur at this level of success. (Doc. 123 at 32.) Plaintiff contends that the Federal Defendants failed to respond adequately to these critical comments in its BiOp. *Id.* at 32-33.

Federal Defendants counter that they did not rely upon the 85 percent passage figure for their jeopardy analysis. (Doc. 140 at 38.) Federal Defendants claim that it adheres to the best available science mandate to acknowledge another biological review team's estimate. *Id.* The Court agrees. The plain language of the BiOp seems to suggest that the Federal Defendants noted, but did not rely on, the 85 percent passage figure. NFWS0003137 ("set an expectation that the channel will pass 85%").

17

Federal Defendants' ITS authorized a passage rate of 41 percent (a take rate of 59 percent). This figure strikes the Court as the operative passage rate that Federal Defendants relied on for jeopardy purposes. The ITS incorporated this 41 percent passage rate figure and the BiOp explains the reasoning for choosing it for inclusion in the ITS. NFWS0003137; NFWS0003155-56. Federal Defendants did not violate the ESA's best available science requirement by noting, but not relying on, the 85 percent passage figure in their jeopardy analysis.

Plaintiff next argues that Federal Defendants' expressed uncertainty regarding fish passage belies their no jeopardy conclusion. (Doc. 123 at 33-35.) Plaintiff notes the BiOp's incongruous statements that "it is impossible to prove whether fish will, or will not, use the new bypass channel," but that "it is reasonable to expect the proposed bypass channel will pass fish more often and in greater numbers than the current ephemeral channel." (Doc. 103-2 at 3.) Plaintiff claims that Federal Defendants have failed to support this reasonable expectation with any evidence that overcomes their conceded uncertainty with respect to the bypass's success. (Doc. 123 at 34.) Plaintiff cites to *NWF II* for the proposition that the risk of uncertainty must be borne by the project in an ESA context, rather than the species. *NWF II*, 184 F. Supp. 3d at 904. Plaintiff asserts that the pallid sturgeon unacceptably bear the risk that the Project will fail to provide passage.

18

The Court agrees with Federal Defendants that the ESA accepts some uncertainty. Doc. 140 at 39-40, citing *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010). The Ninth Circuit in *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014), concluded that the best available science standard "does not . . . require an agency to conduct new tests." This no new test requirement applies even if "the only available data is weak and thus not dispositive, an agency's reliance on such data does not render the agency's determination arbitrary and capricious." (internal citations omitted).

The Ninth Circuit affords wide latitude to Federal Defendants under the best available science standard, in terms of acting in the face of severe uncertainty. The lack of data concerning the pallid sturgeon troubles the Court in light of their dire circumstance, but the best available science standard does not require the Federal Defendants to "conduct new tests" beyond the minimal data that they have accumulated. *Id.*

Plaintiff finally asserts that Federal Defendants have violated the best available science standard by failing to account for the operation of the Fort Peck Dam in their jeopardy analysis. (Doc. 123 at 35-36.) Plaintiff notes that the Federal Defendants' operation of the Fort Peck Dam continues to obstruct all spawning of pallid sturgeon on the Missouri River. (Doc. 123 at 35-36.) Plaintiff cites to *Pac. Shores Subdivision Cal. Water Dist. V. U.S. Army Corps of Eng'rs*, 538 F. Supp.

19

2d 242, 253 (D.D.C. 2008), for the proposition that Federal Defendants must account for other agency actions in the environmental baseline and "assess[] the *net* impact on the listed species and its habitat." (emphasis added).

The plaintiffs in *Pac. Shores* argued that the Service had used an improper environmental baseline by considering the natural breaching levels of the lakes at issue. The record indicated that the lakes generally had been breached artificially in the past. *Id.* The court concluded that the environmental baseline proved proper on the grounds that "FWS did not include this assumption about natural breaching to the exclusion of a consideration of the effects of past private actions such as artificial breaching." *Id.* The court emphasized that the Service had "for each potentially affected species . . . considered the direct and indirect effects of the proposed breaching in light of the past artificial breaches." *Id.*

Federal Defendants properly have included Fort Peck Dam's operations in the environmental baseline. Federal Defendants cite to multiple instances in the BiOp where they plainly acknowledge that Fort Peck Dam operations completely have obstructed, and continue to obstruct, pallid sturgeon spawning on the Missouri River. Doc. 140 at 42, citing NFWS0003112 (explaining blocked access to spawning as a result of Fort Peck Dam); NFWS0003112-15 (discussing reduced drift distance as a result of Fort Peck Dam); NFWS0003114-15 (discussing negative influences on spawning cues and water temperature as a result of Fort

20

Peck Dam); NFWS0003111 (addressing the spawning but lack of recruitment that

occurred below Fort Peck Dam in 2014); NFWS0003150 (explicitly mentioning

the negative effects resulting from the operation of Fort Peck Dam in the no

jeopardy finding). These BiOp citations indicate that Federal Defendants have

"considered the direct and indirect effects of the proposed [Project] in light of [Fort

Peck Dam operations]." *Pac. Shores*, 538 F. Supp. 2d at 253. The best available

science standard requires no more.

The Court's determination on this point stands in light of Federal

Defendants' offered supplemental authority, *Defs. of Wildlife v. Zinke*, No. 15-

55806, 2017 WL 2174546 (9th Cir. May 18, 2017). (Doc. 149.) The Ninth Circuit

in *Zinke* determined that the Service did not violate the ESA's best available

science standard when it made a no jeopardy finding in the face of uncertainty. *Id.*

at *6. A lack of scientific consensus regarding the desert tortoise's required habitat

corridor caused the uncertainty. *Id.* Federal Defendants similarly complied with the

best available science standard when they made a no jeopardy finding in the midst

of biological uncertainty regarding the pallid sturgeon.

## 2. NEPA Claims

NEPA requires action agencies—the Bureau of Reclamation and the Corps

in this case—to analyze fully the environmental impacts of a proposed action if

that action would significantly affect the environment. 42 U.S.C. § 4332. NEPA

21

analysis culminates in an EIS that serves as a transparency measure for the public and a means for the agency to take a "hard look" at environmental impacts before it initiates an action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989). Plaintiff seeks to obtain a preliminary injunction in part on the basis that the Federal Defendants' operative NEPA document for the Project, the 2016 EIS, proves deficient on three distinct theories.

## A. Failure to Differentiate Among Alternatives

Plaintiff argues first that Federal Defendants violated NEPA by equating the environmental impacts of the multiple pump alternative and the bypass alternative, despite evidence that the bypass alternative would result in a more negative environmental impact for the sturgeon. (Doc. 123 at 38-42.) Plaintiff cites to *Ctr. for Biological Diversity v. U.S. Dep't of Interior ("CBD")*, 623 F.3d 633, 645 (9th Cir. 2010), for this claim. The Ninth Circuit in *CBD* determined that an EIS proved insufficient when it equated the environmental impacts of transferring ownership of public land to a mining company with the impacts of keeping ownership in the hands of the federal government. *Id.* at 636.

The Court in *CBD* emphasized that the agency could not claim that the environmental impacts of transferring ownership of the land proved "not possible to predict" or "speculative," when "the FEIS iself contain[ed] detailed information about the mining activities that [the mining company] intend[ed] to conduct on the

22

selected lands." *Id.* at 645. The agency had presented these acknowledged foreseeable impacts "in a manner not easily found in the EIS," and they proved "less speculative than [the agency] suggests." *Id.*

The EIS likewise violates NEPA when it equates environmental impacts across the multiple pump alternative and the bypass alternative. Federal Defendants acknowledge differentiation among alternatives with respect to probability of successful passage, but they do so similar to the agency in *CBD*, "in a manner not easily found in the EIS." *Id.* The summary tables and graphs in the EIS that represent easily-interpreted, comparative information equate or obfuscate the environmental impacts of the two alternatives. For example, the EIS contains a comprehensive table that reflects all impacts from each alternative and proves easy to read and comprehend. (Doc. 104-1 at 198.) The table reflects that the bypass alternative "meets FWS criteria and has high potential to pass fish" and states only "open river" in the multiple pump alternative's box. *Id.* The table appears to represent a confusing summary at best, and a pointed concealment at worst, on the part of Federal Defendants.

Federal Defendants present their use of the Fish Passage Connectivity Index ("FPCI") as a meaningful comparison of alternatives in the EIS. (Doc. 140 at 44.) The FPCI aims to provide a relative comparison of fish passage success among alternatives. *Id.* The EIS stated that the bypass alternative scored a 0.67 on the

FPCI, and the multiple pump alternative scored a 1.00. (Doc. 104-3 at 269, 278-79.) The EIS interpreted these results, however, in a way that roughly equated the fish passage prospects between the two alternatives.

The EIS states that the bypass alternative has "a high likelihood of fish encountering [the] passageway . . . and it would be accessible and meet BRT criteria for pallid sturgeon passage." *Id.* at 269. The EIS states that the multiple pump alternative offers "unhindered passage." The narrative explanations of these numbers prove crucially important in this instance because the FPCI represents a new metric used by Federal Defendants. The controversial methodology behind this metric appears only in an appendix that most members of the public probably would find confusing to read. NUSACE0006450. A member of the public who read the narrative evaluations of fish passage prospects would consider both alternatives to present similarly high chances of success.

Federal Defendants highlight some differentiation in the EIS between the environmental impacts of the two alternatives. Federal Defendants' efforts to explain, distill, and compile information in the EIS, however, overshadow this differentiation. These summaries prove the easiest to digest by the public, but they also confusingly portray the bypass alternative as providing roughly equal environmental impacts as the multiple pump alternative. NEPA's public awareness

24

aim does not allow this conclusion when the EIS itself contains conflicting information. *See CBD*, 623 F.3d at 645.

## B. FCPI Index

Plaintiff also claims that Federal Defendants' use of the FPCI to measure cost effectiveness violated NEPA. (Doc. 123 at 42-44.) Plaintiff argues that the FPCI represents an inappropriate comparative metric on the basis that it has not faced peer review and various commenters have criticized its use. *Id.* at 43. Plaintiff emphasizes that Federal Defendants concede that they did not intend the FPCI to predict the "statistical probability" of fish passage. (Doc. 123-3 at 7; Doc. 123-2 at 61.)

Federal Defendants' use of the FPCI concerns the Court in light of its lean scientific support. Federal Defendants possess a wide latitude of deference as federal agencies, however, when they choose between various scientific models. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014). Federal Defendants' use of a metric that has not been peer-reviewed does not alone violate NEPA. *Lands Council v. Martin*, 529 F.3d 1219, 1226 (9th Cir. 2008). The Court conversely must be "at its most deferential" in evaluating Federal Defendants' use of the FPCI in light of the Project's demand that they operate at the "frontiers of science." *Id.* Federal Defendants' use of the FPCI proves allowable under NEPA in light of the great deference afforded to Federal

Defendants on this issue. *San Luis*, 747 F.3d at 610; *Lands Council*, 529 F.3d at 1226.

## C. Fort Peck Dam Impacts

Plaintiff's final NEPA argument focuses on the Federal Defendants alleged failure to consider the cumulative impact of the operation of Fort Peck Dam in the EIS. (Doc. 123 at 44-48.) NEPA regulations require Federal Defendants to analyze cumulative impacts. NEPA defines cumulative impacts as impacts "result[ing] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

NEPA requires only that Federal Defendants include cumulative impacts in the environmental baseline against which they evaluate the incremental impacts of the Project. *Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1112 (9th Cir. 2015). The EIS correctly acknowledged the low numbers of wild pallid sturgeon that currently exist between Fort Peck Dam and the headwaters of Lake Sakakawea. NUSACE0004973. The EIS also described the Fort Peck Dam's outsized role in preventing successful recruitment of pallid sturgeon. NUSACE0005164. These citations illustrate that Federal Defendants have included the operation of Fort Peck Dam in the environmental baseline. NEPA requires no more. Plaintiff is thus unlikely to succeed on the merits under this theory.

## 3. CWA Claim

26

Plaintiff lastly argue that Federal Defendants' issuance of a CWA § 404 permit for the Project violates § 404's substantive standards. (Doc. 123 at 48-51.) Section 404's substantive standards prevent the Army Corps of Engineers "from issuing a § 404(b) permit if there is a less [environmentally] damaging practicable alternative." *Utahns v. Dep't of Trans.*, 305 F.3d 1152, 1186-87 (10th Cir. 2002). Practicable alternatives prove "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Plaintiff claims that Federal Defendants have not completed the proper analysis under this framework on the basis that they only have compared the practicability of the multiple pump and bypass alternatives. (Doc. 123 at 50.) Plaintiff asserts that Federal Defendants have not deemed the least environmentally-damaging alternative—the multiple pump alternative—impracticable and thus have not completed the analysis required to issue the § 404 permit. *Id.*

Plaintiff correctly characterizes the analysis as requiring Federal Defendants to deem the least environmentally-damaging alternative as impracticable in order to proceed with a different alternative. 40 C.F.R. § 230.10(a). The Tenth Circuit in *Utahns* confirmed the contours of the analysis when it stated that "[u]nder the CWA, the test is not whether a proposed project is better than an alternative with less wetlands impact because it would cost less and have less impact on existing

27

and future development. The test is whether the alternative with less wetlands impact is impracticable." *Utahns*, 305 F.3d at 1186. Federal Defendants have identified the FPCI as the manner in which they differentiate between the alternatives with respect to environmental impacts. (Doc. 140 at 65.) The multiple pump alternative presents a more favorable FPCI figure than the bypass alternative and thus represents the least environmentally-damaging alternative by Federal Defendants' own measure. (Doc. 104-3 at 269, 278-79.)

Federal Defendants first must have found that the multiple pump alternative proved infeasible in order to select a different alternative. Federal Defendants have fallen short of this determination, however, when they stated that all alternatives "were found to be potentially practicable." NUSACE0006650. The CWA does not allow Federal Defendants to select the bypass alternative, as they did, without first reasonably finding that the multiple pump alternative proved impracticable. They instead found that the multiple pump alternative proved "potentially practicable." NUSACE0006650. Plaintiff successfully has demonstrated a likelihood of success on the merits on its CWA claim. *Utahns*, 305 F.3d at 1186; NUSACE0006650.

## b. Irreparable Harm

Plaintiff asserts that the Project would result in irreparable harm to its members' interests in the pallid sturgeon in the absence of an injunction. (Doc. 123 at 51-54.) Federal Defendants posit that construction on the Project will not result

28

in increased irreparable harm to the pallid sturgeon because the Project will not impede passage more than the status quo. (Doc. 140 at 16.) The Court rejected this position earlier in this case by stating that it "fails to recognize that Federal Defendants' continued operation of the existing weir constitutes the reason that pallid sturgeon cannot swim upriver." (Doc. 73 at 16.) The Court also determined that irreparable harm likely would result on the grounds that Federal Defendants had not adequately demonstrated that the Project would pass pallid sturgeon. *Id.* at 17.

It appears that Federal Defendants still have failed to demonstrate that the Project would pass pallid sturgeon in light of the likely ESA, NEPA, and CWA violations discussed in this order. Neither the Project, nor the condition of the pallid sturgeon, has meaningfully changed since the Court issued the above cited Order concerning irreparable harm. (Doc. 73 at 16-17.) Plaintiff has demonstrated that irreparable harm likely would result in the absence of an injunction.

## c. Balance of Equities and Public Interest

The equities must tip in Plaintiff's favor and the proposed preliminary injunction must be in the public interest in order for the Court to issue the preliminary injunction on NEPA or CWA grounds. *Winter*, 555 U.S. at 20; *Cottonwood*, 789 F.3d at 1090-91. Plaintiff argues that the balance of equities tips

29

in its favor and that the preliminary injunction would be in the public interest for three reasons.

Plaintiff first notes that this case primarily concerns an endangered species, and the balance of equities factor and the public interest factor "always weigh[] in the species' favor." *Cascadia Wildlands v. Scott Timber Co.*, 190 F. Supp. 3d 1024, 1036 (D. Or. 2016). Plaintiff next asserts that the Ninth Circuit has held that the equities weigh in favor of an injunction, and the public interest would be served by an injunction when an environmentally damaging project would otherwise proceed in violation of NEPA. Doc. 123 at 55-56, citing *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011); *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009). Plaintiff lastly contends that the public interest and balance of equities factors weigh in favor of the proposed injunction in light of its modest duration. (Doc. 123 at 56.)

The Court agrees with Plaintiff. It appears from the Court's preliminary analysis of the merits that Federal Defendants likely violated NEPA and the CWA by proceeding with this project without adequate analysis. It would not lie within the public interest to expend tax payer funds and likely inflict further harm on the pallid sturgeon by initiating the Project now. The balance of equities weighs in

favor of, and the public interest calls for, a preliminary injunction until the Court can decide this case on the merits.

## d. Bond

The Court still holds the $500 bond that Plaintiff paid in 2015. The Court requires no further bond.

Accordingly, IT IS ORDERED:

1. Plaintiff's Motion for Preliminary Injunction (Doc. 122), is GRANTED.

2. Plaintiff and Federal Defendants shall file a mutually agreed upon scheduling order that sets deadlines for Federal Defendants' lodging of the administrative record and both parties' summary judgment briefing within 14 days of the filing of this Order. The Court will file a scheduling order if the parties cannot come to an agreement within 14 days. The Court will set a hearing for summary judgment oral arguments after the parties file their proposed scheduling order.

Dated this 5th day of July, 2017.

Brian Morris
United States District Court Judge