

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**GREAT FALLS DIVISION**

|  |  |
|---|---|
| DEFENDERS OF WILDLIFE, and NATURAL RESOURCE DEFENSE COUNCIL<br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS; UNITED STATES BUREAU OF RECLAMATION; and UNITED STATES FISH AND WILDLIFE SERVICE,<br>Defendants<br><br>and<br><br>LOWER YELLOWSTONE IRRIGATION PROJECT BOARD OF CONTROL, SAVAGE IRRIGATION DISTRICT, and INTAKE IRRIGATION DISTRICT<br>Defendant-Intervenors. | CV-15-14-GF-BMM<br><br><br>**ORDER** |

## I. BACKGROUND

This matter comes to the Court following an Order from the Ninth Circuit

that dissolved a preliminary injunction imposed by the Court on July 15, 2017.

(Doc. 185.) The United States Fish and Wildlife Service ("FWS") listed pallid

sturgeon as endangered in 1990. 55 Fed. Reg. 36, 641. The largest wild pallid

sturgeon population in the world exists on the Missouri River between the Fort Peck Dam and Lake Sakakawea. Fewer than 125 wild pallid sturgeons remain. NBOR0000018. The presence of the Fork Peck Dam on the Missouri River and the Intake Dam on the Yellowstone River account, in large part, for this decline. NBOR0000024. The Intake Dam sits approximately seventy miles upriver from the confluence of the Yellowstone River and the Missouri River. These two barriers prevent the pallid sturgeon from swimming far enough upriver to spawn successfully.

After spawning, the pallid sturgeon larvae drift while they are developing. NBOR0000016-17. The drift distance can range from 152 to 329 miles. *Id.* The lower oxygen levels found in a lake environment significantly decrease pallid sturgeon survival rates. NUSACE0015437-38. Larvae hatched below the Intake Dam lack sufficient "drift distance" to develop before they reach the lower oxygen levels in the water of Lake Sakakawea. *Id.* The larvae would have the opportunity to develop sufficiently before they reached Lake Sakakawea if pallid sturgeon could spawn upstream of the Intake Dam. This extra development time likely would render the pallid sturgeon able to swim and thereby remain in the more hospitable river environment.

The Corps operates the Fort Peck Dam. NUSACE0037198. The Corps possesses discretionary control over the operation of Fort Peck Dam for multiple

2

purposes, including flood control, irrigation, hydropower generation, recreation, and management of fish and wildlife. *Id.* The Corps has completed two formal consultations with FWS that address the impacts of the agency's Fort Peck Dam operations on pallid sturgeon. The first consultation occurred when FWS issued a biological opinion ("2000 BiOp"). NUSACE0028982-29014.

The 2000 BiOp determined that the Corps's operation at Fort Peck Dam likely would jeopardize pallid sturgeon by precluding the species from successfully reproducing in the wild. *Id.* The 2000 BiOp provided reasonable and prudent alternatives ("RPAs"), as required by the ESA, that if implemented would have allowed the Corps to comply with the ESA. The Corps failed to implement these RPAs.

FWS issued an amended BiOp in 2003 ("2003 BiOp"). NUSACE26256-553. FWS concluded again that the Corps's Fort Peck Dam operations jeopardize the pallid sturgeon. NUSACE0026423-24. The 2003 BiOp prescribed a series of RPAs that would have allowed for compliance with the ESA. NUSACE0026464-86. The Corps again failed to implement the essential elements of these RPAs. The Corps and FWS re-initiated consultation on the Fort Peck Dam operations for a third time in 2015. NBOR0000011.

The Bureau operates Intake Dam and oversees the four irrigation districts known as the Lower Yellowstone Irrigation Project ("LYP"). NBOR0014429. The

3

Intake Dam consists of a wood structure topped with rocks along the crest. The existing weir requires nearly annual replacement of rocks on the crest to hold back sufficient water to service irrigation needs. NBOR0014514-15. The Bureau accomplishes this task currently with a series of large buckets transported on cables above the river. *Id.*

The Bureau and the Corps adopted a plan in 2010 to construct a new permanent concrete diversion dam, a rock-lined ramp over the dam for pallid sturgeon passage, and a new headworks facility with fish screens to reduce the entrainment of fish in the irrigation canal. NBOR0004779. The Bureau and the Corps constructed the new headworks facility in 2012. NBOR0017165. The Bureau and the Corps abandoned the plan to build the concrete dam with a rock ramp, however, primarily due to costs.

The Bureau and the Corps ultimately identified the construction of a new dam and artificial bypass channel as the preferred solution ("the Project"). The Bureau and the Corps intend to spend $57 million to replace the existing wood and rock weir at Intake Dam with a concrete weir to ensure continued irrigation water to the 56,800 acres currently serviced by Intake Dam. NBOR0014527-28.

Five pallid sturgeons successfully used a natural side channel around the existing weir in 2014 during unusually high water. NBOR0000033-34, 38. Federal Defendants decided that a new bypass channel, which would have sufficient flow

4

all the time, provided the best option to allow pallid sturgeon to navigate around the proposed concrete weir. NBOR0012310.

## II. **PROCEDURAL HISTORY**

Plaintiff Defenders of Wildlife filed their initial Complaint in February of 2015. (Doc. 1.) The Court granted Plaintiff's Motion for Preliminary Injunction on September 4, 2015, to enjoin Federal Defendant agencies ("Federal Defendants") from initiating construction on the Project. The Court ordered Federal Defendants to complete an Environmental Impact Statement ("EIS"). (Doc. 73.) The Court specifically emphasized the need for Federal Defendants to analyze recovery of pallid sturgeon and whether the Project would prevent recovery. The Court also identified the need for Federal Defendants to analyze whether the Project would be successful in providing passage past the Intake Dam for pallid sturgeon.

Federal Defendants completed an EIS and issued a biological opinion ("BiOp") in Fall of 2016, and issued a Record of Decision ("ROD") on December 2, 2016, in response to the Court's order. (Doc. 101 at 9.) The Court dissolved the preliminary injunction on April 19, 2017. (Doc. 118.) The Court also granted Plaintiff's Motion for Leave to file a Fourth Supplemental Amended Complaint. *Id.*

Federal Defendants' new National Environmental Policy Act ("NEPA") decisional documents—the 2016 EIS and the 2016 ROD—sufficiently corrected

5

the Federal Defendants' NEPA violations at the heart of the original preliminary injunction. (Doc. 118.) Plaintiff filed a Fourth Supplemental Amended Complaint on April 20, 2017, that incorporated challenges to Federal Defendants' 2016 NEPA and ESA documents. (Doc. 119).

The Court granted Plaintiff's Motion for a Preliminary Injunction to halt the construction related to the Project and preserve the status quo on July 5, 2017. (Doc. 155.) The Court reasoned that Plaintiff likely would succeed on the merits for their ESA, NEPA, and CWA claims as contained in their Fourth Supplemental Amended Complaint. The Ninth Circuit subsequently vacated this second preliminary injunction on April 4, 2018. (Doc. 185.)

The Ninth Circuit determined that this Court improperly considered the harm caused by the "continued operation of the existing weir" in its assessment of the irreparable harm attributable to the Project. *Id.* at 3. This Court wrongly flipped the burden to require that the Corps prove that the Project would allow successful pallid sturgeon passage rather than require that Plaintiff prove irreparable harm. *Id.* at 4. The Ninth Circuit further determined that this Court lacked any basis to conclude that Plaintiff had established a likelihood of success on the merits of its claims under the ESA, NEPA, and the CWA. *Id.*

Plaintiff brings its current Motion for Summary Judgment on the basis of Claims 1, 2, 4, 5, and 11-14 of the Fourth Supplemental Amended Complaint.

6

Claims 1 and 2 challenge the decade-long operations of the Fort Peck Dam by the Corps in violation of the ESA. Claims 4 and 5 challenge the decade-long operations of the Intake Dam by the Bureau in violation of the ESA. Claim 11 challenges the Corps's and the Bureau's 2016 EIS and ROD for violations of NEPA. Claim 12 challenges FWS's 2016 BiOp for violations of the ESA. Claim 13 challenges the Corps's and the Bureau's reliance on the 2016 BiOp for violations of the ESA. Claim 14 challenges the Corps's 2016 CWA approval of the Project.

## III. **LEGAL STANDARD**

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

The Court reviews NEPA, ESA, and CWA compliance through the Administrative Procedures Act ("APA"). *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 891-91 (9th Cir. 2002); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830-31 (9th Cir. 1986). The APA instructs a reviewing court to "hold unlawful and

set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

APA review requires the Court to consider whether an agency based a particular decision on "consideration of the relevant factors." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted). This inquiry must be "thorough," "probing," and "in-depth." *Id.* at 415. The Court generally must defer to the judgment of the agency. *League of Wilderness Defs.- Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir. 2008).

The Court should reverse a decision as arbitrary and capricious only where "a clear error of judgment" has occurred. *Id.* This "clear error of judgment" may entail the following scenarios: 1) the agency's reliance on factors "Congress did not intend [for] it to consider;" 2) the agency's failure to "consider an important aspect of the problem;" 3) the agency's explanation "runs counter to the evidence" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## IV. ANALYSIS

### A. FWS's 2016 BiOp and Incidental Take Statement ("ITS") for the Project does not violate the ESA.

The ESA serves as a safety net for species at risk of extinction and facilitates the recovery of imperiled species. 16 U.S.C. § 1531(b). Section 7(a)(2) requires

federal agencies, in consultation with the expert wildlife agency, to ensure that "any action authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the species' designated "critical habitat." 16 U.S.C. § 1536(a)(2), (4). To jeopardize a species means to "reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

The ESA requires a consultation process that results in FWS issuing a biological opinion ("BiOp"). The BiOp details whether the proposed federal action likely would cause jeopardy and identifies RPAs. 16 U.S.C. § 1536(b)(3)(A). RPAs encompass those actions that FWS "believes would not violate section 7(a)(2) and can be taken by the federal agency in implementing agency actions." 16 U.S.C. § 1536(b)(3)(A).

Section 9 prohibits any person from "taking" members of an endangered species of fish or wildlife. 16 U.S.C. § 1538(a)(1)(B). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The first part of ESA consultation requires the agency to work with FWS to produce a BiOp that concludes whether the proposed action would cause jeopardy. This BiOp may

9

determine, however, that the agency's proposed action could result in incidental take of listed species.

The consulting agency, in this case, FWS, must issue an ITS to the action agency. The ITS formulates the extent of take, or, in the alternative, a surrogate for triggering re-initiation of consultation between the agency and FWS. 16 U.S.C. § 1536(b)(4). The ITS exempts the take from Section 9 liability when two conditions have been fulfilled: the proposed federal action must result in take that remains incidental to the proposed action and the terms and conditions of the ITS have been fulfilled. 16 U.S.C. §§ 1536(b)(4); (o)(2).

### i. FWS analyzed whether a take of fifty-nine percent of adult pallid sturgeon approaching the Project would jeopardize the species.

Plaintiff argues that the BiOp fails to evaluate the impact of the fifty-nine percent take of adult pallid sturgeon that would reach the Project each year. (Doc. 173 at 51.) Plaintiff further argues that the BiOp fails to analyze whether the Project likely would jeopardize the species if that level of take occurs. Plaintiff argues that this omission by FWS likens the case to *Southwest Center for Biological Diversity v. Bartel*, 470 F.Supp.2d 1118, 1155 (S.D. Cal. 2006). The district court in *Bartel* deemed the BiOp unlawful where the BiOp recognized a twelve percent take for two endangered fair shrimp species, but failed to evaluate whether the species could withstand a loss of that magnitude. *Id.*

This Court previously found "unavailing" Federal Defendant's citations to a BiOp that purportedly analyzed the impact of the authorized take limit. (Doc. 155 at 10.) The first BiOp citation described FWS's reasoning for choosing the fifty-nine percent take figure and explained that FWS anticipated more successful passage. *Id.* The second BiOp citation referred to the jeopardy finding without any reference to the fifty-nine percent take authorization. *Id.* This Court determined that softening the requirements of the jeopardy analysis on the basis that the ITS included an overestimate of take did not make for sound public policy. *Id.* at 11. This type of analysis would encourage agencies always to overestimate take in the ITS. *Id.*

The Ninth Circuit disagreed. The Ninth Circuit determined that FWS had articulated a "reasoned basis for the no-jeopardy finding in its Biological Opinion." (Doc. 185 at 5.) The Ninth Circuit further determined that the "agency's approved incidental take represents a substantial reduction in the impairment of breeding caused in the project's absence." *Id.* The Ninth Circuit recognized that analysis of the ITS and identification of a recovery goal sometimes may be needed to explain the reasoned basis for an agency's no-jeopardy finding. *Id.* The Ninth Circuit determined, however, that the Project required no such analyses. *Id.* The Ninth Circuit also determined that this Court committed legal error when it treated the

absence of a specific ITS analysis and the failure to identify a quantifiable recovery goal as technical deficiencies that precluded a no-jeopardy finding in the BiOp. *Id.*

Federal Defendants contend that Plaintiff fails to recognize that FWS already had concluded that the Project, including the post-construction adverse effect of blocked passage, remained not likely to jeopardize pallid sturgeon. FWS identified two general post-construction effects associated with the bypass channel: (1) a beneficial effect of allowing more pallid sturgeon to pass than would otherwise occur under existing conditions; and (2) an adverse effect associated with some pallid sturgeon not using the constructed bypass channel. NBOR0000050. FWS acknowledged that the only information about how many pallid sturgeon would use the bypass channel dated from 2014.

The ESA provides an explicit statutory sequence. The agency first must determine whether adverse effects would jeopardize a species. 50 C.F.R. § 402.14(g). If the agency concludes the proposed action likely would not jeopardize the listed species, the agency must consider the development of the ITS and the surrogate trigger for reinitiating consultation. 16 U.S.C. § 1536(b)(4). The ITS provides a "trigger" that when reached, results in an unacceptable level of incidental take and requires the parties to reinitiate consultation. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1249 (9th Cir. 2001). FWS

12

complied with this statutory sequence in formulating an ITS trigger of fifty-nine percent for reinitiating consultation.

FWS analyzed whether the Project, and specifically the post-construction effects of the bypass channel, would jeopardize the pallid sturgeon before it formulated its fifty-nine percent trigger in the ITS. NBOR0000050. FWS concluded that the Project, on balance, would not jeopardize the pallid sturgeon. NBOR0000064. Plaintiff attempts to invert the statutory sequence. The ESA imposes no obligation on FWS to perform a subsequent analysis on the ITS trigger. 16 U.S.C. § 1536(b)(4).

FWS recognized in the BiOp that migrating pallid sturgeon would face both beneficial and adverse effects from the Project when they encountered the bypass channel. NBOR0000058-59, 50. FWS concluded, on the whole, that the proposed bypass channel would provide more reliable passage than the current channel as the existing channel often lacks sufficient flows to fill for passage during spawning season. NBOR0000025. The Court in *Bartel* found arbitrary the inconsistencies between the agency's expectation of no impact on the vernal pools and the design of the City's plan that allowed from nine percent to fourteen percent direct impact on vernal pools habitat. *Bartel*, 470 F.Supp.2d at 1148. Unlike in *Bartel*, FWS acknowledges that the Project would present adverse effects to the pallid sturgeon

population. FWS ultimately determined, however, that the Project on balance "substantially improves the survival and recovery of the species." NBOR0000064.

### ii. FWS evaluated the Project's impact on the pallid sturgeon's survival and recovery.

Federal Defendants must analyze project impacts on survival and recovery of the species. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. ("NWF I")*, 524 F.3d 917, 931 (9th Cir. 2008). Plaintiff contends that FWS failed to identify a benchmark against which FWS can gauge the Project's impacts. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527-28 (9th Cir. 2010). Plaintiff argues that FWS merely speculated that the Project would be an "improvement." Plaintiff contends that this assertion by Federal Defendants fails to address whether the Project would place pallid sturgeon survival and recovery at risk.

The Court determined in its preliminary injunction Order that Federal Defendants failed to provide sufficient information to demonstrate that the Project would improve a situation that they concede to be dire. The Court instructed Federal Defendants to analyze whether the Project would improve the pallid sturgeon's "plight to give it a chance at survival and recovery." (Doc. 155 at 16.) The Court relied on *National Wildlife Federation v. National Marine Fisheries Service ("NWF II")*, 184 F. Supp. 3d 861, 888 (D. Or. 2016), and *NWF I* for the assertion that the ESA requires a quantifiable recovery metric or goal.

14

The Ninth Circuit reversed on this point. The Ninth Circuit recognized that identification of a "recovery goal may sometimes be needed to explain the reasoned basis for an agency's no-jeopardy finding," but also concluded that such analyses were not required in this case. (Doc. 185 at 5.) The Ninth Circuit stressed that even though the BiOp did not identify a quantifiable recovery goal, the BiOp adequately addressed the Project's overall positive impact on species recovery. *Id.*; *cf. American Rivers v. Fed. Energy Regulatory Comm'n*, 2018 WL 3320870, at *10 (D.C. Cir. 2018) (reversing renewal of license for hydropower dams based upon FWS's failure to account for the impact of continued operations of the dams in jeopardy analysis). The Ninth Circuit apparently interpreted Section 7(a)(2) as remaining concerned with whether the action would cause too much harm, rather than whether the action would improve a species' status. *NWF I*, 524 F.3d at 929-30. Plaintiff's view conflicts with the regulatory definition of "jeopardize" under this interpretation of Section 7(a)(2).

The Ninth Circuit determined in *NWF I* that nothing in Section 7(a)(2) consultation requires action agencies to recover a species. *NWF I*, 524 F.3d at 936. The ESA instead requires "some attention to recovery issues" to provide "reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." *Id.* FWS's analysis in the BiOp leads to the conclusion that

the proposed agency action provides a net positive for the pallid sturgeon. FWS

found that the pallid sturgeon's chance of survival and recovery likely would

increase once the Project has been completed. NBOR0000061. The Project does

not jeopardize the pallid sturgeon's "continued existence" in this context. 16

U.S.C. § 1536(a)(2).

### iii. FWS supported its conclusion in the BiOp that the Project would represent an improvement to the likelihood of survival and recovery of the pallid sturgeon. FWS properly used the shovelnose sturgeon population to compare with the pallid sturgeon population.

Plaintiff contends that pallid sturgeon survival and recovery in the wild

remains impossible without recruitment. Plaintiff argues that FWS failed to

analyze the three specific steps for recruitment of the species: (1) whether adults

would actually use the Project to migrate upstream; (2) whether enough adult

pallid sturgeons would migrate upstream to produce sufficient larvae at locations

that would make survival possible; and (3) whether sufficient larvae would survive

the downstream drift. Plaintiff cites these shortcomings in the BiOp's analysis.

Plaintiff next challenges what it considers the BiOp's arbitrary comparison

of the pallid sturgeon's larval survival during downstream drift to the shovelnose

sturgeon population. Plaintiff argues that the best available science indicates that

the shovelnose sturgeon do not compare to the pallid sturgeon due to significant

biological and behavioral differences. These differences include shovelnose

sturgeon larvae requiring only 58-155 miles of river habitat for their downstream drift. NUSACE0024394. Pallid sturgeon larvae, by comparison, require 150-330 miles of river habitat for their downstream drift. NUSACE0019216.

Federal Defendants argue that federal agencies do not have to guarantee every stage of the pallid sturgeon lifecycle. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1052. There FWS entered a memorandum of agreement with several non-federal entities who were subject to a Nevada State Order regarding a ground water pumping project that had the potential to affect the Moapa dace, an endangered fish species. The Ninth Circuit declined to broaden FWS's obligations to ensure the survival of the Moapa dace in the face of state-mandated ground water pumping. *Id.* The ESA instead required FWS to consider "whether the action, taken together with the cumulative effects, is likely to jeopardize the continued existence of the listed species." *Id.* The BiOp made clear that the negative effects to the Moapa dace arose from state-mandated groundwater pumping. FWS considered this groundwater pumping as part of the project's cumulative effects outside the agency's control. *Id.*

FWS analyzed whether the bypass channel would improve upstream migration. NBOR0000048-50. The agencies specifically designed the bypass channel with a bottom type preferred by the pallid sturgeon. *Id.* FWS determined that the bypass channel would provide specific flow volumes for both passage and

attraction. *Id.* FWS estimated that somewhere between forty-one percent and eighty-five percent of motivated adult pallid sturgeon would use the bypass channel. NBOR0000050. FWS acknowledged that significant uncertainty exists on this point. NBOR0000053. FWS argues, however, that the biological parameters of the bypass channel would allow motivated adults to migrate into the upper Yellowstone River basin. *Id.* The ESA admittedly allows for some uncertainty. *Salazar*, 606 F.3d at 1164. The existing scientific research does not allow FWS to provide any more specificity or precision about where the pallid sturgeon would spawn in the upper basin even if the Yellowstone River were to be restored to an open river.

Federal Defendants further argue that FWS reasonably concluded in the BiOp that potential spawning habitats exist in the upper Yellowstone River basin. FWS tracked the upstream migration of one female and four males in 2014. FWS presumed that the female spawned in the Powder River, a tributary to the Yellowstone River upstream of the Intake Dam. NBOR00000025. FWS determined that sufficient numbers of pallid sturgeon would be motivated to spawn into this available habitat if reliable passage were provided, especially considering the historical population of pallid sturgeon. NBOR0000034. FWS further determined that hatchery pallid sturgeon soon will become sexually mature and naturally would seek out spawning opportunities. NBOR0000063. These factors

18

support FWS's conclusion that the Project likely would improve the survival and recovery of pallid sturgeon. Similar to *Center for Biological Diversity*, the Project represents an improvement for pallid sturgeon and the Court will defer to the findings of the BiOp. *Ctr. for Biological Diversity*, 807 F.3d at 1052.

The small number of wild adult pallid sturgeon forces FWS to rely on the shovelnose sturgeon as a surrogate to anticipate the effects to larvae and to create a monitoring protocol. NBOR0000056-57. A surrogate by definition need not be identical. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127 (9th Cir. 2012). The Ninth Circuit recognized that "various components of the ecological landscape ... [can] be used as a surrogate for defining the amount or extent of take if the conditions [are] linked to the take of the protected species." *Id.*

FWS acknowledged the differences between the shovelnose sturgeon and pallid sturgeon. NBOR0000057. It remains reasonable for FWS to evaluate the specific interaction between the existing weir and shovelnose sturgeon larvae to provide some idea as to how a new weir might affect pallid sturgeon larvae as these present similar interactions. NBOR0000057; *Ctr. for Biological Diversity*, 698 F.3d at 1127. The Court must defer to FWS's scientific judgment in choosing to use the shovelnose sturgeon as a surrogate.

19

### iv. FWS evaluated the short-term impacts of the Project in the context of a rapidly declining pallid sturgeon population.

Plaintiff argues that the Ninth Circuit continually has rejected BiOps that ignore short-term effects and only examine whether long-term effects would be beneficial. *NWF I*, 524 F.3d at 934-35. The Ninth Circuit in *NWF I* rejected a biological opinion where it failed to consider the impacts of the project in the context of the three-salmon species' short life cycles. *Id.*

FWS conceded that no upstream passage would occur during construction of the Project. NBOR0000062. Plaintiff contends that the long lifespan of pallid sturgeon does not excuse the BiOps' failure to examine the short-term effects of the Project. Plaintiff points to the fact that the few remaining wild pallid sturgeon nearing the end of their lifespan remain at risk during construction of the Project. Plaintiff further contends that no support exists that hatchery raised pallid sturgeon can or would successfully reproduce. NBOR0000023.

FWS considered the short-term adverse effects of continued maintenance of the existing weir, possible interactions with the fish screens, as well as the adverse effects caused by construction of the bypass channel. NBOR0000043-47. FWS recognized that the existing high flow channel would need to be filled during construction. NBOR0000047. This existing high flow channel provides only occasional access for pallid sturgeon passage during the highest water years. In fact, the record indicates that only a handful of pallid sturgeon have used the high

flow channel in the past during perfect water conditions. *Id.* FWS estimated that the existing bypass channel would contain enough water for the pallid sturgeon to use it, statistically speaking, during one year of construction of the new bypass channel. *Id.*

FWS further estimated that about thirty-two adult wild pallid sturgeon would be blocked from spawning by the construction of the Project. These pallid sturgeon represent approximately twenty-six percent of the current adult wild population. FWS considered this blockage to constitute a "temporary, but significant impairment of breeding and is considered an 'injury' to the sturgeon." NBOR0000058. The impairment represents the status quo, however, as it does not actually change the current reproduction, numbers, or distribution of pallid sturgeon in the action area. *Id.*

The ESA further contemplates artificial propagation to conserve or recover listed species. 16 U.S.C. § 1532(a). The Ninth Circuit has recognized that hatchery fish appropriately may be considered under the ESA. *Trout Unlimited v. Lohn*, 559 F.3d 946, 955 (9th Cir. 2009). National Marine Fisheries Service ("NMFS") in *Lohn* rejected petitions filed by Trout Unlimited that sought to split natural and hatchery fish into separate evolutionarily significant units ("ESU"), or in other words, species. *Id.* at 953. The Ninth Circuit disagreed.

The ESA required NMFS to "determine whether any species is an endangered species or a threatened species." 16 U.S.C. § 1533(a)(1). A species, in turn, includes "any subspecies of fish or wildlife or plants, and any distinct population segment." 16 U.S.C. § 1532(16). The Ninth Circuit concluded that review of the entire ESU remained consistent with the ESA's overall focus on preserving natural populations. *Lohn*, 559 F.3d at 958. Federal Defendant likewise reasonably relied on the hatchery pallid sturgeon when considering the short-term effects of the Project as hatchery fish appropriately may be considered under the ESA. *Id.* The Ninth Circuit determined, in reversing the Court's preliminary injunction Order, that "the agency articulated a reasoned basis for the no-jeopardy finding in its BiOp." (Doc. 185 at 5.) This no-jeopardy finding contemplated hatchery fish.

### v. FWS issued a lawful ITS under the statute and regulations.

FWS's regulations expressly provide for the use of another species to serve as a surrogate in the ITS. 50 C.F.R. § 402.14(i)(1)(i). FWS's ITS recognizes that if the Project were constructed and pallid sturgeon spawn successfully upstream, larvae produced by this spawning may be killed or injured at the Project site during the drift downstream. FWS relies on a surrogate, the shovelnose sturgeon, to measure the allowable take and provide a trigger for re-initiation of consultation.

No pre-existing data exists for FWS to analyze. FWS cannot measure the number of pallid sturgeon larvae drifting down the river after the Project's completion to determine whether the concrete weir would present a larger impact on take than otherwise would occur. To monitor the shovelnose sturgeon surrogate, FWS required the Bureau to "establish a rate of occurrence, injury and death from the screens and new weir structure." NBOR0000069. The Bureau will continue to monitor for shovelnose and pallid larva after completion of the Project. *Id.* From this data the Bureau will compare the rate of occurrence, injury, and death for pallid and shovelnose larvae. *Id.* The level of exempted take would be exceeded if there proves to be a "statistically significant deviation in the survival, death or injured rates between pallid and shovelnose" larva. The Bureau would be required to reinitiate consultation under these circumstances. *Id.*

Plaintiff argues that FWS failed to set a clear standard for determining when the level of take has been exceeded and provided no meaningful trigger for the re-initiation of consultation. Plaintiff contends that FWS's reliance on the shovelnose sturgeon as a surrogate proves unlawful as the surrogate does not measure accurately the effects of take on the pallid sturgeon population. Plaintiff suggests that FWS has failed to support its conclusion that the shovelnose sturgeon remains adequately linked to the pallid sturgeon. Plaintiff further argues that a clear

violation of the ESA occurs when the ITS allows take of all adult pallid sturgeon during construction of the Project.

Re-initiation of consultation "is required . . . if new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b). The best available data suggests, and FWS agrees, that there would be only a "very small level of mortality" of pallid sturgeon larvae. NBOR0000052. As a result of this assumption, re-initiation would be triggered if monitoring demonstrates that 100 percent, or even a significant number of larvae, are killed by the Project. 50 C.F.R. § 402.16(b). FWS lawfully may use a surrogate. *Ctr. for Biological Diversity*, 698 F.3d at 1127. In the absence of data regarding pallid sturgeon larvae it proves reasonable that FWS used the shovelnose sturgeon as a surrogate to determine whether the Project would cause take of pallid sturgeon larvae at the weir beyond the very small amount of mortality currently contemplated. *Id.*

The ITS identifies that adult pallid sturgeon take may occur during the construction phase. NBOR0000067. FWS estimates that up to thirty-two pallid sturgeon would be taken in the form of harm by injury through impairment of reproduction. *Id.* FWS included the trigger for this form of take. *Id.* The thirty-two pallid sturgeon will be represented by a percentage of the telemetered population. *Id.* The tagging effort of wild pallid sturgeon for telemetry data continues each

year as part of ongoing monitoring. NBOR0000044. On average thirty-six percent of the wild pallid sturgeon population are telemetered. *Id.* FWS assumed that up to twenty-six percent of the telemetered population could be detected at the Intake Dam in any given year. A detected portion of the telemetered population at the weir greater than twenty-six percent would mean that a larger portion of the population proves present and are impeded from passing above the weir. *Id.* Re-initiation would be triggered in this scenario. The Court will defer to FWS in providing the trigger in the ITS for re-initiation.

## B. The Bureau's and the Corps's reliance on the BiOp to authorize the Project did not violate their ESA section 7 substantive duty.

Plaintiff argues that the Bureau and the Corps possess an independent duty to ensure that their actions likely would not to jeopardize pallid sturgeon. Plaintiff contends that the Bureau and the Corps knew of the deficiencies in the BiOp and that independent biologists repeatedly have raised significant concerns about the Project's ability to provide for pallid sturgeon survival and recovery.

A federal agency may not evade its responsibility to ensure that its actions will not jeopardize a listed species. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). An agency's decision to rely on a biological opinion must not be arbitrary or capricious. *Id.* An agency's reliance on a biological opinion will satisfy its obligation under the ESA, however, even if the agency bases the biological opinion on "admittedly weak" information,

25

as presented here, if the challenging party can point to no new information that undermines the biological opinion's conclusions. *Id.*

For instance, the Pyramid Lake Paiute Tribe of Indians ("Tribe") brought an action against the Department of Navy ("Navy"). The Tribe alleged that the Navy's practice of leasing acreage and contiguous water rights to local farmers threatened the continued viability of the cui-ui, a rare fish species, in violation of the ESA. The Ninth Circuit determined that the Navy had not arbitrarily or capriciously relied on the "admittedly weak" biological opinion as the Tribe had failed to put forth any new information that FWS should have considered in rendering the biological opinion. *Id.* at 1416.

The Court recognizes that significant deficiencies exist in the BiOp, particularly with regard to its "admittedly weak" information on whether pallid sturgeon actually would use the proposed bypass channel. Similar to *Pyramid Lake*, however, Plaintiff has pointed to no new information that demonstrates that the Bureau's and Corps's actions proved arbitrary and capricious. *Id.* Plaintiff possesses the affirmative burden to establish a violation of Section 7(a)(2) of the ESA to demonstrate that the Bureau and the Corps are jeopardizing a listed species. Plaintiff may not simply perceive deficiencies in the BiOp.

Plaintiff has failed to carry the burden contemplated in *Pyramid Lake*. The continued existence of the weir remains exempt from the Plaintiff's ESA challenge

to the Project. (Doc. 185 at 3.) This exemption means that Plaintiff cannot rely on the current weir to demonstrate that the agencies' actions would jeopardize pallid sturgeon. The Corps and the Bureau are attempting to implement a high priority action that furthers the recovery of pallid sturgeon. Plaintiff has failed to demonstrate how this action would jeopardize the listed species beyond its current dire circumstance. *Pyramid Lake*, 898 F.2d at 1415.

## C. The Bureau's and the Corps's ROD and EIS for the Project does not violate NEPA.

NEPA mandates no particular result. It simply prescribes necessary processes that the federal agencies must follow when contemplating a major federal action. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). NEPA requires federal agencies: (1) to take a "hard look" at the environmental impacts of their proposed actions, and (2) to ensure transparency by providing a mechanism for the public to learn about and comment on the impacts of a proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989). Agencies must prepare an EIS for any "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Court previously determined that Federal Defendants had failed in this duty when it ordered Federal Defendants to complete an EIS. (Doc. 73).

Plaintiff argues that the agencies once again have failed in the EIS to present the public with a clear, meaningful, and candid comparison between the

27

environmental consequences of the Bypass Channel and the Multiple Pumps Alternatives. Plaintiff relies heavily on this Court's previous conclusion that Plaintiff remained likely to prevail as the EIS obscured the differences between the impacts of the Multiple Pumps and the Bypass Channel Alternatives. (Doc. 155 at 24.)

The Ninth Circuit in *Center for Biological Diversity v. U.S. Department of Interior ("CBD")*, 623 F.3d 633, 645 (9th Cir. 2010), determined that an EIS proved insufficient when it equated the environmental impacts of transferring ownership of public land to a mining company with the impacts of keeping ownership in the hands of the federal government. *Id.* at 636. *CBD* makes clear that an agency violates NEPA when it arbitrarily reaches a conclusion without analyzing a critical distinction between two proposed alternatives. *Id.*

Federal Defendants argue that Plaintiff focuses on a single summary table, Table 2-39, in construing this claim. Federal Defendants contend that this table presents a qualitative comparison of the impacts of the different alternatives. Federal Defendants argue that the comments provided by the public throughout the process demonstrate that the agencies satisfied their obligation to provide candid, accurate information regarding the effects of the proposed alternatives.

The Ninth Circuit concluded that this Court's analysis failed to support its arbitrary and capricious finding in issuing the preliminary injunction. (Doc. 185 at

6.) The Ninth Circuit cites the agencies' analysis of the differing environmental consequences of the Bypass Channel and the Multiple Pumps Alternative. The Ninth Circuit determined that the agencies in this case performed the appropriate analyses. *Id.* As such, the standard from *CBD* does not appear to apply in this situation.

The FEIS, as a whole, proved adequate for Plaintiff and the public to identify and understand the differences among the alternatives being studied. The FEIS further proved to be adequate for Plaintiff and the public to formulate their objections as evidenced by the public comments submitted. The Bureau's and the Corps's ROD and EIS for the Intake Project does not violate NEPA.

## D. The Corps selected the Bypass Channel Alternative in accordance with the Section 404(b)(1) Guidelines.

The CWA prohibits the Corps from issuing a § 404(b) permit for projects that involve the discharge of dredged or fill material into waters of the United States if a less damaging practicable alternative exists. 40 C.F.R. § 230.10(a). Practicable alternatives must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). To compare the impacts of practicable alternatives, the Corps must analyze specific categories of aquatic ecosystem impacts, including impacts to ESA-listed species. 40 C.F.R. § 230.11.

Plaintiff argues that the Corps's CWA analysis of the Project's aquatic ecosystem impacts applied the wrong standard under 40 C.F.R. § 230.10(a) by not comparing practicable alternatives. (Doc. 173 at 83.) Plaintiff contends that the Corps instead arbitrarily assumed that the Bypass Channel "has a similar scale of environmental impacts as the other alternatives." *Id.*; NBOR0018659. Plaintiff contends that Multiple Pumps Alternative represents the least environmentally-damaging alternative as it would provide a more beneficial impact on aquatic biological characteristics by restoring a free-flowing, natural Yellowstone River. (Doc. 173 at 84.)

Plaintiff contends that the Corps must disapprove the Project absent a determination that the less invasive Multiple Pumps Alternative would be impracticable. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1187 (10th Cir. 2002). The Corps determined that the Bypass Channel would be more practicable than the Multiple Pumps Alternative in light of the extra costs of construction and annual maintenance associated with the Multiple Pumps Alternative. Plaintiff contends that the relevant CWA standard does not contemplate inquiry into the relative practicalities of alternatives. *Del. Riverkeeper v. U.S. Army Corps of Eng'rs*, 869 F.3d 148, 159-60 (3d Cir. 2017).

Federal Defendants counter that Plaintiff misstates the Project's "overall purpose." This misstatement improperly tips the scales against an objective

assessment of the Corps's application of the Guidelines. *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989). Federal Defendants contend that the Corps must consider the Project's overall objectives when applying the Guidelines' "practicable alternative" analysis. The purpose of the proposed action remains "to improve fish passage for pallid sturgeon and other native fish at Intake Diversion Dam, continue the viable and effective operation of the LYP, and contribute to ecosystem restoration." NBOR0018642. The Corps determined that the Multiple Pumps Alternative does not represent a "practicable alternative" that would have a less adverse impact on the aquatic ecosystem when considered against the Project's overall objectives. These overall objectives include the continued viable and effective operation of the LYP.

The Multiple Pumps Alternative would improve passage for the pallid sturgeon. It remains in doubt, however, whether the Multiple Pumps Alternative would satisfy the Project's purpose of "continuing the viable and effective operation of the LYP." The Corps's CWA Analysis determined the Multiple Pumps Alternative's practicability to be "highly questionable" as a result of its inherently complicated design of gravity combined with pumps that require "highly precise timing on the startup and shutdown of each pump." NUSACE0004921, NUSACE0006644. The Corps and the Bureau concluded that using the Multiple Pumps Alternative design would result in pumping volumes that

31

"will be highly variable from year to year" and that the "risk of [canal] bank failures would increase due to the multiple locations of pumped inflows" and the attendant need for additional monitoring and coordination. *Id.*

The Corps applied the Guidelines and identified concerns over the Multiple Pumps Alternative's impacts on the economic viability of the LYP. The Multiple Pumps Alternatives involved an estimated cost of construction of $132 million. The expected cost of maintenance would be $4.9 million per year. These higher construction and maintenance costs could have a direct impact on its "practicability." These costs also may undermine the Project's overall purpose when considering the viable and effective operation of the LYP.

The Ninth Circuit in *Hintz*, 800 F.2d at 833, reviewed a CWA § 404 permit. The Army Corps of Engineers issued a CWA § 404 permit that authorized a landowner to fill a seventeen-acre area as part of its sawmill/log export complex. The landowner listed two other practicable alternative sites for its sorting yards. The landowner argued, however, that either of the alternative sites would include substantial additional costs. *Id.* at 833. The Ninth Circuit upheld the Corps's determination that "no practicable alternative existed" considering the "substantial additional costs" and complex logistics associated with the project. *Id.*; 40 C.F.R. § 230.10(a)(2).

The Ninth Circuit similarly determined in *Jones v. National Marine Fisheries Service*, 741 F.3d 989, 1001 (9th Cir. 2013), that an agency may consider a project's economic requirements to determine whether alternative sites would be practicable. The Corps may not allow the present unavailability of sufficient financial resources, however, to be the main determinant to a finding of impracticability. *Nat'l Wildlife Fed'n v. Adams*, 629 F.2d 587, 593 (9th Cir. 1980). The Ninth Circuit in this matter determined that the Corps expressly found that no practicable alternative to the proposed project existed that would have a less adverse impact on the sturgeon populations. (Doc. 185 at 7.) The Ninth Circuit further determined that ample evidence in the record provided support for the determination that no practicable alternative existed. *Id.*

The Corps, in conducting the CWA analysis, must compare the impacts of practicable alternatives, including analyzing specific categories of aquatic ecosystem impacts. 40 C.F.R. § 230.11. The Corps correctly completed this analysis even though the Multiple Pumps Alternative had been designed only to a conceptual level at the time of the FEIS. This analysis proved sufficient in light of the agencies having applied the Corps's cost estimating guidance to update project prices, "adopted contingencies to reflect" the incomplete data associated with each alternative's design stage, and "attempted to maintain similar assumptions across all five alternatives." NUSACE0006262; NUSACE0006271.

**E.    The Bureau ensured that its existing operation of the Intake Dam did not jeopardize the pallid sturgeon.**

Plaintiff argues that the Bureau's continued operation of the Intake Dam, specifically the yearly rocking, violates the Bureau's independent, substantive duty under ESA section 7 to ensure that its actions do not jeopardize listed species. Plaintiff contends that the evidence accumulated over more than two decades proves that the Intake Dam operations prevent pallid sturgeon from successfully reproducing in the Yellowstone River. Plaintiff argues that the Bureau improperly takes pallid sturgeon through its ongoing operation of the Intake Dam without a valid ITS by preventing the pallid sturgeon from breeding upstream. The 2016 BiOp and ITS address only the ongoing operation of the Intake Dam in the context of the BiOp's assumption that the Project would replace the existing dam. (Doc. 182 at 55.)

The ESA must not be applied retroactively. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 186 n. 32 (1978). The Ninth Circuit further has recognized that the existence of a statutorily authorized dam, as opposed to the operation of a dam, cannot violate a federal statute unless "a clear and manifest" intention remains to repeal the prior Congressional authorization. *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1178 (9th Cir. 2004). NWF contended that the ROD arbitrarily and capriciously had distinguished between the Corps's operation of the dams and the existence of the dams. The Ninth Circuit determined that

34

review of the Corps's conclusions in the ROD did not extend to Congress's decision to create the dams sixty years earlier. *Id.*

It remains clear that no clear Congressional repeal occurred in this case. The existing weir, constructed in 1910, clearly pre-dates the ESA. Plaintiff must provide some new evidence that the agencies' proposed action renders arbitrary the agencies' course of action. *Pyramid Lake*, 898 F.2d at 1415. As noted previously, the Ninth Circuit in *Pyramid Lake* upheld a federal agency's reliance on a faulty biological opinion when the challenging party failed to bring forth any new information that the agency should have considered in rendering the BiOp. *Id.* at 1416.

Plaintiff focuses on the Irrigation District's yearly rocking of the weir. Plaintiff has failed to demonstrate, however, how this action reduces "reproduction, numbers, or distribution" of the species when the yearly rocking maintains the status quo over the last 100-plus years. 50 C.F.R. § 402.02. FWS determined that the rock debris field would still block passage for decades to come even if the Irrigation District failed to perform the yearly rocking. NBOR0000043 n. 6. Plaintiff has failed to present new information to demonstrate that the Bureau and the Corps further jeopardize the pallid sturgeon through their yearly rocking of Intake Dam.

This determination derives from the assumption that the Corps and the Bureau will complete the Project contemplated here. The Court will dismiss Plaintiff's claims without prejudice to allow it to refile the claims in the event that the Corps and the Bureau fail to follow through with their plan to develop the Project with its new bypass channel.

**F.     Plaintiff's ESA challenge to the Corps' Operation and Maintenance of Fort Peck Dam proves moot at this stage.**

Plaintiff contends that the Corps's operation of the Fort Peck Dam violates its ESA section 7 substantive duty to avoid jeopardy and violates its ESA section 9 prohibition against unpermitted take. Plaintiff alleges that these claims constitute substantive violations of sections 7 and 9 of the ESA. Plaintiff insists that they do not challenge either the Corps's failure to comply with section 7's procedural obligation to complete consultation, or the merits of the 2003 BiOp.

Federal Defendants argue that the Corps's re-initiation of consultation with FWS on July 31, 2015, rendered "prudentially moot" Plaintiff's sections 7 and 9 claims. Federal Defendants further argue that the FWS's issuance of its new BiOp on the Missouri River system will render these claims constitutionally moot. FWS's new BiOp will supersede the 2003 BiOp.

A federal court's jurisdiction is limited to cases or controversies. U.S. Const. art. III, § 2. A claim will be deemed moot if it has lost its character as a present, live controversy. *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124

(9th Cir. 1997). The claim must be dismissed if an event occurs that prevents the court from granting effective relief. *Id.*

The agency's initiation of consultation under section 7(a)(2), triggers the operation of section 7(d). 16 U.S.C. § 1536(d). Section 7(d) provides that "[a]fter initiation of consultation" an agency "shall not make any irreversible or irretrievable commitment of resources" that would foreclose "the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)." Plaintiff does not argue, however, that the Corps has violated section 7(d). Plaintiff has made no allegations that the Corps irreversibly or irretrievably have committed resources that would preclude formulation of a reasonable and prudent alternative.

The administrative record demonstrates that the Corps re-initiated consultation in July 2015. This re-initiation rendered prudentially moot the claims against the Corps's operations of the Fort Peck Dam. *Hunt v. Imperial Merchant Servs.*, 560 F.3d 1137 (9th Cir. 2009). These same claims will be rendered constitutionally moot when FWS completes the consultation and issues its new BiOp. *Am. Rivers*, 126 F.3d at 1124. Plaintiff's claims must be dismissed for lack of jurisdiction at this point.

The Court notes that the 2000 BiOp contemplated a number of RPAs that could have allowed the Corps to comply with the ESA. NUSACE0028982-29014.

The Corps failed to implement the RPAs contemplated by both the 2000 BiOp. The Court further notes that the 2003 BiOp contemplated a number of RPAs that could have allowed the Corps to comply with the ESA. NUSACE0026464-86. Once again the Corps failed to implement the RPAs contemplated by the 2003 BiOp. This record provides little comfort that the Corps will implement any RPAs that may arise from the 2015 re-initiation of consultation between the Corps and FWS regarding the operation of the Fort Peck Dam. As noted previously, the Corps and the Bureau have chosen instead to focus all their efforts, and associated burdens, in attempting to comply with the ESA on the Intake Dam and the proposed Project.

The Court agrees that the Corps's actions have rendered moot Plaintiff's claims regarding Fort Peck Dam at this time. The Corps and the Bureau cannot continue to stall implementation of RPAs described in each succeeding BiOp, and avoid complying with the mandates of the ESA, as enacted by Congress, however, simply by engaging in serial re-initiation of consultation to develop RPAs that the Corps and the Bureau have shown little appetite to implement. The day of reckoning will come when the Corps and the Bureau must actually complete the consultation process with the incorporation of RPAs, as no one, including the Corps and the Bureau, stands above the law.

## V. **CONCLUSION**

For the foregoing reasons, IT IS ORDERED:

Plaintiff's Motion for Summary Judgment (Doc. 172) on Claims 11-14 is DENIED;

Federal Defendants'/Intervenor Defendants' Cross-Motions for Summary Judgment (Docs. 180 & 178) on Claims 11-14 are GRANTED;

Plaintiff's request that the Court order the Bureau to finalize a plan to bring its operation at Intake Dam into compliance with the ESA (Claims 4 & 5) is DISMISSED WITHOUT PREJUDICE; and

Plaintiff's request that the Court order the Corps to finalize a plan to bring its operation of Fort Peck Dam into compliance with the ESA (Claims 1 & 2) has been rendered moot and thereby is DISMISSED WITHOUT PREJUDICE.

Dated this 20th day of July, 2018.

Brian Morris
United States District Court Judge